# EXHIBIT "C"

Electronically FILED by Superior Court of California, County of Los Angeles on 10/04/2021 12:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Vargas,Deputy Clerk
21CHCV00774

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Rexford Industrial Realty, L.P., a Maryland limited partnership and DOES 1-100

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Stephen Mastey

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:
*(El nombre y dirección de la corte es):* Chatsworth Courthouse
9425 Penfield Ave.
Chatsworth, CA 91311 | CASE NUMBER: *(Número del Caso):*
**21CHCV00774** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Nnana U. Awa, Esq., LAW ANGELES, A.P.C. 3055 Wilshire Blvd., Suite #600, Los Angeles, CA 90010, (213) 514-5680

| DATE:
*(Fecha)* 10/04/2021 | Sherri R. Carter Executive Officer / Clerk of Court
Clerk, by
*(Secretario)* M. Vargas | , Deputy
*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Rexford Industrial Realty, L.P.
   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☒ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| | | **Page 1 of 1** |

| Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov* |

Electronically FILED by Superior Court of California, County of Los Angeles on 10/04/2021 12:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Vargas,Deputy Clerk
21CHCV00774

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Nnana U. Awa, Esq.<br>LAW ANGELES, A.P.C.<br>3055 Wilshire Blvd., Suite #600, Los Angeles, CA 90010<br><br>TELEPHONE NO.: (213) 514-5680    FAX NO. *(Optional):*<br>ATTORNEY FOR *(Name):* nnana@lawangeles.com | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES
STREET ADDRESS: 9425 Penfield Ave.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles 91311
BRANCH NAME: Chatsworth Courthouse

CASE NAME:
STEPHEN MASTEY vs REXFORD INDUSTRIAL REALTY, LP., A MARYLAND LIMITED PARTNERSHIP

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] Unlimited   [ ] Limited<br>(Amount   (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 21CHCV00774<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[x] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [x] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* 4
5. This case [ ] is  [x] is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 4, 2021

Nnana U. Awa, Esq.
_____          ▶          _____
(TYPE OR PRINT NAME)                                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std 3.10<br>*www.courts.ca.gov* |

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition

CM-010 [Rev. July 1, 2007]                **CIVIL CASE COVER SHEET**                        Page 2 of 2

| SHORT TITLE: Mastey v. Rexford | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: Mastey v. Rexford | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034 Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation        Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☑ A6023 Wrongful Eviction Case | ~~2, 6~~ |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032 Quiet Title | 2, 6 |
| | | ☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 2 of 4

SHORT TITLE: Mastey v. Rexford | CASE NUMBER

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Mastey v. Rexford | CASE NUMBER |
|---|---|

**Step 4:** **Statement of Reason and Address**: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

**REASON:**

☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☑ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11.

ADDRESS:

25413 Rye Canyon Road

| CITY: | STATE: | ZIP CODE: |
|---|---|---|
| Santa Clarita | CA | 91355 |

**Step 5:** **Certification of Assignment:** I certify that this case is properly filed in the North Valley _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: October 4, 2021

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

Electronically FILED by Superior Court of California, County of Los Angeles on 10/04/2021 12:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Vargas,Deputy Clerk
21CHCV00774

Assigned for all purposes to: Chatsworth Courthouse, Judicial Officer: Stephen Pfahler

1  Nnana U. Awa, Esq. SBN 320323
2  LAW ANGELES, A.P.C.
   3055 Wilshire Blvd, Suite #600
3  Los Angeles, CA 90010
   (213) 514-5680
4  nnana@lawangeles.com
5  Attorney for PLAINTIFF STEPHEN MASTEY

6           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

7        **COUNTY OF LOS ANGELES – CHATSWORTH COURTHOUSE**

8  STEPHEN MASTEY,                    **PLAINTIFF STEPHEN MASTEY CIVIL**
9           Plaintiff,                **COMPLAINT**  21CHCV00774

10 vs.                                **CAUSES OF ACTION**
                                      **1. WRONGFUL EVICTION**
11                                    **2. BREACH OF CONTRACT**
   REXFORD INDUSTRIAL REALTY, L.P., a **3. BREACH OF IMPLIED WARRANTY**
12 Maryland limited partnership and DOES 1 **OF QUIET ENJOYMENT**
   through 100, inclusive,            **4. BREACH OF GOOD FAITH AND FAIR**
13                                    **DEALING**
14          Defendant

15     PLAINTIFF STEPHEN MASTEY hereby brings this complaint (this "Complaint")

16 against REXFORD INDUSTRIAL REALTY, L.P., a Maryland limited partnership

17 ("Defendant"), based upon the following:
18
19 Parties

20     1. Plaintiff is, and at all relevant times herein, an individual allowed to do business in the

21 State of California County of Los Angeles.

22     2. Defendant is, and at all relevant times herein, a Maryland limited partnership, existing

23
   under and allegedly by virtue of the laws of the State of California, and doing business in the
24
   County of Los Angeles, State of California.
25
26     3. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES

27 1-100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will

28
                       PLAINTIFF COMPLAINT - 1

amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff 's damages as herein alleged were proximately caused by their conduct.

4.  At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each and every defendant was the agent or employee of each and every other defendant. In doing the things alleged in the causes of action into which this paragraph is incorporated by reference, each and every defendant was acting within the course and scope of this agency or employment and was acting with the consent, permission, and authorization of each of the remaining defendants. All actions of each defendant alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of every other defendant.

## STATEMENT OF FACTS

5.  This matter involves a breach of good faith and fair dealing of a commercial lease agreement (the "Lease"), copy attached hereto as **EXHIBIT "A"**,  between Plaintiff and Defendant, breach of the agreement by Defendant, and wrongful eviction and termination by Defendant.

6.  On or around March 12, 2019 Plaintiff and Defendant entered into the Lease for the premises located at 25413 Rye Canyon Road, Santa Clarita, CA 91355 (the "Premises").

7.  Throughout the course of the tenancy Defendant allowed for the Premises to deteriorate and fall need to improvements for which Plaintiff made Defendant aware of.

PLAINTIFF COMPLAINT - 2

8.  Additionally, Plaintiff made a security deposit ("Security Deposit") payment pursuant to subparagraph 1.F. of the Lease in an amount of One Hundred Thousand and 00/100 Dollars ($100,000.00).

9.  Plaintiff acknowledges that Plaintiff missed rental payments owed to Defendant ("Rent") pursuant to the Lease for the months of March and April 2020.

10. Rent payments missed were due to the COVID-19 pandemic (the "Pandemic").

11. Defendant however made Plaintiff aware that Defendant allocated part of the Security Deposit to the missed Rent as (a) evidenced by the email correspondence between agent of Defendant and Plaintiff on or around August 21, 2021 (the "Email"), copy attached herein as **EXHIBIT "B"** and (b) allowed pursuant to Paragraph 5 of the Lease.

12. Nevertheless, on or around August 12, 2021, Defendant moved to evict Defendant through an unlawful detainer eviction proceeding, case number 21CHCV00606 absent notice to Plaintiff as required by Paragraph 23 of the Lease, contrary to the protections for commercial properties provided by the City of Santa Clarita and County of Los Angeles, and in violation of the Lease.

13. Plaintiff now brings this Complaint against Defendant.

### First Cause of Action

### Wrongful Eviction

14. Plaintiff realleges and incorporates as set forth in full herein paragraphs 1 through 13, inclusive.

15. Defendant, as the stated landlord of the Premises according to the Lease, leased the Premises to Plaintiff on or around March 12, 2019.

16. Pursuant to the Lease, Plaintiff was to make Rent payments to Defendant in exchange for commercial use and occupation of the Premises.

17. For the months of March and April 2020, Plaintiff was unable to make Rent payments to Defendant due to the Pandemic.

18. Plaintiff made Defendant known of the impact the Pandemic had on Plaintiff's commercial business for which Plaintiff used the Premises for.

19. Defendant thereafter used the Security Deposit and deducted the missed Rent payments from the Security Deposit.

20. However, Defendant thereafter initiated an unlawful detainer lawsuit against ("UD Case") against Plaintiff to evict Plaintiff from the Premises.

21. The City of Santa Clarita initiated an emergency moratorium effective March 4, 2020 and for the duration of Governor Gavin Newsom ("Newsom")'s eviction moratorium by businesses impacted by the Pandemic.

22. Newsom's moratorium for evictions  was thereafter extended to the end of September 2021.

23. Moreover, the County of Los Angeles implemented an eviction moratorium ban on commercial tenant from March 4, 2020 through September 30, 2021.

24. The County of Los Angeles has since extended the moratorium for commercial tenants to January 31, 2022.

25. Defendant however brought the UD Case against Plaintiff knowing that the missing Rent payments were due to the Pandemic.

PLAINTIFF COMPLAINT - 4

26. Additionally, the county of Los Angeles states that landlords must provide a commercial tenant with nine or fewer employees a copy of their rights under the moratorium within 10 days of being served with a non-payment.

27. Plaintiff's commercial business operates with no more than nine employees which also includes the named Plaintiff.

28. Furthermore, Defendant never provided Plaintiff with a notice to perform with regards to Rent payments with Plaintiff under the justifiable belief that Defendant used the Security Deposit for past missed Rent payments.

29. Lastly, Defendant's eviction proceedings against Plaintiff were initially filed on or around August 12, 2021, a little over one month before the eviction moratorium was to end for commercial tenants.

30. As a result Defendant's actions taken against Plaintiff are such that arise under wrongful eviction as governed by the State of California, County of Los Angeles, and City of Santa Clarita.

### Second Cause of Action

### Breach of Contract

31. Plaintiff realleges and incorporates as set forth in full herein paragraphs 1 through 30, inclusive.

32. Paragraph 5 of the Lease states that the Defendant can deduct from the Security Deposit any debts owed by Plaintiff pursuant to the Lease.

33. Paragraph 5 also states that should Defendant make any deduction, Plaintiff shall, upon requests by Defendant, restore the deducted amount from the Security Deposit in no less than ten (10) days.

34. Defendant deducted from the Security Deposit the Rent payment for the months of March and April 2020.

35. Defendant never requested for Plaintiff to restore the Security Deposit.

36. Plaintiff's knowledge that Defendant wanted a restoration of the Security Deposit was only ever made known to Plaintiff by the Email.

37. Additionally, Defendant falsely asserts pursuant to the UD Case that Defendant delivered a notice regarding payment of Rent to Defendant in June 2021.

38. However, Plaintiff both (a) never received any notice or notice delivery from Defendant contrary to the statements made by Defendant in the UD Case nor provide proof of delivery of a notice and (b) did not deliver any notice in accordance with Paragraph 23 of the Lease.

39. Moreover, pursuant to the Lease, Plaintiff was required to make operating expense payments ("Operating Expenses") as identified in 4.B. of the Lease.

40. Plaintiff made the Operating Expense payments with reasonable expectation that Operating Expense payments will go towards specifically stated allocations in the Lease.

41. Defendant however never performed in accordance to duty required by the Operating Expenses paragraph of the Lease.

42. Lastly, after Plaintiff leased the Premises from Defendant and prior to Defendant's actions to evict Plaintiff from the Premises, the Premises incurred multiple issues affecting the Premises in need of repair.

43. These structural issues include, but are not limited to:

    a. Collapsed roof needing repair, leading Defendant to make repairs that resulted in damage to Plaintniff's personal property forcing Plaintiff to halt business for a couple of weeks

b.  Water damage from unsealed windows causing damages to walls and other personal products of Plaintiff

c.  Stolen copper pipe fitting by third party thieves absent intervention by Defendant

44. As a result of Defendant's actions and continued actions, Defendant has breached and is in breach of the Lease.

### Third Cause of Action

### Breach of Implied Warranty of Quiet Enjoyment

45. Plaintiff realleges and incorporates as set forth in full herein paragraphs 1 through 41, inclusive.

46. The implied covenant of quiet enjoyment implies a term in a contract, and a breach of the covenant gives rise to an action in contract. *Ginsberg v. Gamson* (2012) 205 Cal.App.4[th] 873,896.

47. The implied covenant of quiet enjoyment is breached when there is an eviction, actual or construct, of the tenant. *Marchese v. Standard Realty & Development Co.* (1977) 74 Cal.App.3d 142, 148.

48. As stated before, Defendant has moved to evict Plaintiff from the Premises through the UD Case and also by neglecting from making repairs at the Premises which thereby has affected Plaintiff's business.

49. As a commercial tenant, there is an implied warranty of quiet enjoyment not expressly taken away by Defendant as a landlord.

50. As a result of Defendant's actions, Defendant has breached the implied warranty of quiet enjoyment.

### Fourth Cause of Action

### Breach of Good Faith and Fair Dealing

PLAINTIFF COMPLAINT - 7

51. Plaintiff realleges and incorporates as set forth in full herein paragraphs 1 through 50, inclusive.

52. Implied in every contract is a covenant of good faith and fair dealing between parties.

53. Defendant has made repeated requests for repairs and eventually had to take on repairs and repair costs on Plaintiff's own volition.

54. Furthermore, Plaintiff was made aware that Defendant neglected to assist Plaintiff for issues raised and is trying to evict Plaintiff from the Premises due to Defendant's intention to remodel and/or sell the Premises to a third party and seeks to evict Plaintiff from Premises in an effort to fulfill Defendant's needs.

55. As a result of Defendant's actions, Defendant is in breach of its duty within the Lease of good faith and fair dealing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant and each of them as follows:

1. The sum of $529,623.00 representing the total cost of Plaintiff's possessory interest and property interest lost pursuant to the breach of contract and good faith and fair dealing, breach of implied warranty of quiet enjoyment, and wrongful eviction by Defendant;

2. For the sum of $100,000.00 representing the Security Deposit payment made by Plaintiff;

3. Punitive damages of 20% of the aforementioned damages amounting to $125,924.60;

4. For compensatory and special damages according to proof;

5. Immediate halt on eviction by Defendant against Plaintiff

6. For reasonable attorneys fees incurred by Plaintiff;

7. For costs of suit incurred by Plaintiff; and

8. For such other and further relief as the Court deems proper.

PLAINTIFF COMPLAINT - 8

Dated this 1ˢᵗ day of October 2021.

Nnana U. Awa, Esq.
Attorney for PLAINTIFF
STEPHEN MASTEY

PLAINTIFF COMPLAINT - 9

# EXHIBIT "A"



**Rexford Industrial**

REXFORD INDUSTRIAL REALTY
## STANDARD INDUSTRIAL
## MULTI-TENANT LEASE - NET

This Lease ("Lease"), dated **March 12** _____, 2019, is made by and between Rexford Industrial Realty, L.P., a Maryland limited partnership ("Landlord"), and the Tenant named below (collectively the "Parties," or individually a "Party").

1.   **BASIC LEASE PROVISIONS**

A.   **Tenant:**   Stephen Mastey

B.   **Premises:**   An approximately 19,105 rentable square foot portion, consisting of approximately 17,505 square feet of ground level space and approximately 1,600 square feet of mezzanine space, of the building located at the street address of 25413 Rye Canyon Road, Unit A, in the City of Santa Clarita, County of Los Angeles, State of California, with zip code 91355, as shown on Exhibit "A" attached hereto ("Premises"). In addition to Tenant's rights to use and occupy the Premises as hereinafter specified, Tenant shall have non-exclusive rights to any Common Areas (as defined in Section 3.A below) of the building containing the Premises ("Building") but shall not have any rights to the roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are here in collectively referred to as the "Project."

C.   **Parking Spaces:**   33 unreserved vehicle parking spaces.

D.   **Commencement Date:**   The Closing Date under the certain Purchase and Sale Agreement dated for reference purposes January 25, 2019 (together with all addenda and amendments thereto, the "Purchase Agreement"), entered into by and between Henri Mastey, as Trustee of the Henri Mastey Living Trust, dated April 21, 1978, and as amended February 26, 1986 ("Seller"), Tenant's father, as seller, and Landlord (or Landlord's predecessor-in-interest), as buyer. Although this Lease may be executed prior to the occurrence of the Closing Date, the Parties hereto shall be bound to the terms herein, subject to the occurrence of the Closing Date under, and as provided in, the Purchase Agreement.

E.   **Lease Term:**   Approximately sixty (60) full calendar months following the Commencement Date and ending on the last day of the month that is sixty (60) full calendar months after the Commencement Date (such date, the "Expiration Date").

F.   **Security Deposit:**   $100,000.00

G.   **Base Rent:**

| Period | Monthly Base Rent |
|---|---|
| Commencement Date through the last day of the twelfth (12th) full calendar month of the Lease Term | $14,328.75 |
| From the first day of the thirteenth (13th) full calendar month of the Lease Term through the last day of the twenty-fourth (24th) full calendar month of the Lease Term | $14,758.61 |
| From the first day of the twenty-fifth (25th) full calendar month of the Lease Term through the last day of the thirty-sixth (36th) full calendar month of the Lease Term | $15,201.37 |
| From the first day of the thirty-seventh (37th) full calendar month of the Lease Term through the last day of the forty-eighth (48th) full calendar month of the Lease Term | $15,657.41 |
| From the first day of the forty-ninth (49th) full calendar month of the Lease Term through the last day of the sixtieth (60th) full calendar month of the Lease Term | $16,127.13 |

H.   **Tenant's Share:**   39.74% of the Project

I.   **Current estimate of Tenant's Share of estimated monthly Operating Expenses (estimate only and subject to adjustment based on actual costs and expenses according to the provisions of this Lease)**   $4,057.93. The estimated monthly Operating Expenses shall include (but are not limited to) (a) the estimated common area operating expenses of $764.20 per month; (b) the estimated Insurance premium costs of $191.15; (c) the estimated Real Property Taxes of $2,742.06; and (d) a property management fee equal to two percent (2%) of Base Rent and Operating Expenses.

J.   **Base Rent and other Monies Due Upon Commencement Date:**

| | |
|---|---|
| Base Rent (first full month) | $14,328.75 |
| Security Deposit | $100,000.00 |
| Estimated Operating Expenses (first month) | $4,057.93 |
| Total Amount Due on Lease Execution | $118,386.68 |

K.   **Early Possession Date:**   Tenant is already in possession of the Premises as the prior owner.

L.   **Permitted Use:**   Assembly and distribution of cosmetic products in accordance with all Legal Requirements (as defined below).

M.   **Broker(s):**   CBRE, Inc. representing Landlord and Seller, Tenant's father, under the Purchase Agreement.

4013376.8
24396-991



INITIALS



**Rexford Industrial**

### REXFORD INDUSTRIAL REALTY
### STANDARD INDUSTRIAL
### MULTI-TENANT LEASE - NET

This Lease ("Lease"), dated _March 12_____, 2019, is made by and between Rexford Industrial Realty, L.P., a Maryland limited partnership ("Landlord"), and the Tenant named below (collectively the "Parties," or individually a "Party").

1. **BASIC LEASE PROVISIONS**

| | | |
|---|---|---|
| A. | Tenant: | Stephen Masley |
| B. | Premises: | An approximately 19,105 rentable square foot portion, consisting of approximately 17,505 square feet of ground level space and approximately 1,600 square feet of mezzanine space, of the building located at the street address of 25413 Rye Canyon Road, Unit A, in the City of Santa Clarita, County of Los Angeles, State of California, with zip code 91355, as shown on Exhibit "A" attached hereto ("Premises"). In addition to Tenant's rights to use and occupy the Premises as hereinafter specified, Tenant shall have non-exclusive rights to any Common Areas (as defined in Section 3.A below) of the building containing the Premises ("Building") but shall not have any rights to the roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are here in collectively referred to as the "Project." |
| C. | Parking Spaces: | 33 unreserved vehicle parking spaces. |
| D. | Commencement Date: | The Closing Date under the certain Purchase and Sale Agreement dated for reference purposes January 25, 2019 (together with all addenda and amendments thereto, the "Purchase Agreement"), entered into by and between Henri Masley, as Trustee of the Henri Masley Living Trust, dated April 21, 1978, and as amended February 28, 1986 ("Seller"), Tenant's father, as seller, and Landlord (or Landlord's predecessor-in-interest), as buyer. Although this Lease may be executed prior to the occurrence of the Closing Date, the Parties hereto shall be bound to the terms herein, subject to the occurrence of the Closing Date under, and as provided in, the Purchase Agreement. |
| E. | Lease Term: | Approximately sixty (60) full calendar months following the Commencement Date and ending on the last day of the month that is sixty (60) full calendar months after the Commencement Date (such date, the "Expiration Date"). |
| F. | Security Deposit: | $100,000.00 |

G. Base Rent:

| Period | Monthly Base Rent |
|---|---|
| Commencement Date through the last day of the twelfth (12th) full calendar month of the Lease Term | $14,328.75 |
| From the first day of the thirteenth (13th) full calendar month of the Lease Term through the last day of the twenty-fourth (24th) full calendar month of the Lease Term | $14,758.61 |
| From the first day of the twenty-fifth (25th) full calendar month of the Lease Term through the last day of the thirty-sixth (36th) full calendar month of the Lease Term | $15,201.37 |
| From the first day of the thirty-seventh (37th) full calendar month of the Lease Term through the last day of the forty-eighth (48th) full calendar month of the Lease Term | $15,657.41 |
| From the first day of the forty-ninth (49th) full calendar month of the Lease Term through the last day of the sixtieth (60th) full calendar month of the Lease Term | $16,127.13 |

| | | |
|---|---|---|
| H. | Tenant's Share: | 39.74% of the Project |
| I. | Current estimate of Tenant's Share of estimated monthly Operating Expenses (estimate only and subject to adjustment based on actual costs and expenses according to the provisions of this Lease) | $4,057.93. The estimated monthly Operating Expenses shall include (but are not limited to) (a) the estimated common area operating expenses of $764.20 per month; (b) the estimated insurance premium costs of $191.15; (c) the estimated Real Property Taxes of $2,742.08; and (d) a property management fee equal to two percent (2%) of Base Rent and Operating Expenses. |

J. Base Rent and other Monies Due Upon Commencement Date:

| | |
|---|---|
| Base Rent (first full month) | $14,328.75 |
| Security Deposit | $100,000.00 |
| Estimated Operating Expenses (first month) | $4,057.93 |
| Total Amount Due on Lease Execution | $118,386.68 |

| | | |
|---|---|---|
| K. | Early Possession Date: | Tenant is already in possession of the Premises as the prior owner. |
| L. | Permitted Use: | Assembly and distribution of cosmetic products in accordance with all Legal Requirements (as defined below). |
| M. | Broker(s): | CBRE, Inc. representing Landlord and Seller, Tenant's father, under the Purchase Agreement. |

4013376.8
24396-991



INITIALS

N.  Guarantor:  None.

O.  Exhibits:  Exhibit "A" - Site Plan Depicting the Premises and Project; Exhibit "B" - Rules and Regulations; Exhibit "C" – Tenant Contact Information Form; Exhibit "D" – ACM Notification.

P.  Addenda:  None.

2.  Granting and Acceptance of Premises.

A.  Grant of Premises and Term. In consideration of the obligation of Tenant to pay Rent (as defined below) as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease. Base Rent set forth in this Lease is not subject to any adjustment should the actual size of the Premises be determined to be different than the approximate size described in the Basic Lease provisions. In the event that the size of the Premises and/or the Project are modified during the Lease Term, Landlord may recalculate Tenant's Share to reflect such modification.

B.  Condition. This Lease is being executed in accordance with the Purchase Agreement, whereby pursuant thereto, Seller sold the Project to Landlord. Tenant, together with Seller, have been in occupancy of the Premises prior to the Commencement Date, is intimately familiar with the Premises, and occupies the Premises in its as-is, where-is condition without any representation or warranty of any kind from Landlord, and agrees that except for the Landlord Work (defined below), Landlord shall have no obligation to perform any work, construct any improvements, make any repairs or perform any maintenance to the Premises as a condition to this Lease. Accordingly, Tenant has accepted the Premises in its condition as of the Commencement Date, AS-IS AND WITH ALL ITS FAULTS, subject to all applicable Legal Requirements. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. Tenant is advised to verify the actual size prior to executing this Lease. Tenant acknowledges that it has had the opportunity to inspect the suitability of the Premises for Tenant's intended use (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with any building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Legal Requirements"), including the Americans with Disabilities Act), and to measure the Premises. Tenant acknowledges that the Premises may contain unpermitted improvements and, notwithstanding anything to the contrary in this Lease, Tenant shall be solely responsible for the cost of remediating and/or obtaining proper permits for such improvements to the extent required by the municipal agency(ies) with authority to so require. NOTE: Tenant is responsible for determining whether or not the Legal Requirements, and, including, without limitation, the zoning, are appropriate for Tenant's intended use, and acknowledges that past uses of the Premises may no longer be allowed. Tenant represents and warrants that it has obtained all required occupancy permits from the applicable municipality and other agencies having jurisdiction over the Premises. No later than 10 days after written demand is made therefor by Landlord of Tenant, Tenant shall execute and deliver to Landlord a Tenant Contact Information Sheet in the form of Exhibit "C", as attached to and hereby made a part of this Lease. Without limitation of the foregoing, Landlord makes no warranty as to (a) the heating, ventilating and/or air conditioning systems ("HVAC") serving the Premises, and (b) the existing electrical, plumbing, fire sprinkler, lighting, loading doors, sump pumps, if any, and all other such Building systems serving the Premises. No person acting on behalf of Landlord is authorized to make, and Tenant acknowledges and agrees that Landlord has not made and specifically negates and disclaims, any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to the Premises.

(1)  Notwithstanding the foregoing, Tenant shall have temporary use of the existing dock-high loading at the Building, as shown on the Site Plan attached hereto as Exhibit "A", for a period of 90 days following the Commencement Date (the "Dock Access Period"). In connection with the dock-high loading, Tenant shall have temporary access through the neighboring unit ("Unit B") to access the dock-high loading during the Dock Access Period. Prior to using the dock-high loading or accessing the dock-high loading through Unit B, Tenant, at its sole cost and expense, shall be responsible for constructing fencing that creates a path of travel for Tenant's ingress and egress through Unit B to the dock-high loading, the location of which shall be subject to Landlord's prior written approval, and the fencing shall be constructed in accordance with all applicable Legal Requirements. Furthermore, Tenant acknowledges and understands that Landlord plans to perform certain construction work to the Building and Unit B (the "Construction Work") during the Dock Access Period. Tenant shall not (and Tenant shall ensure that its contractors and agents do not) interfere in any way with the performance of the Construction Work, and shall cooperate with Landlord in connection with the performance of the Construction Work, including, without limitation, not obstructing access to Unit B while the Construction Work is being performed. Landlord shall have no responsibility for, or for any reason be liable to Tenant for, and Tenant shall not be entitled to any compensation or damages for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from, (a) any direct or indirect injury to or interference with Tenant's business arising from the performance of the Construction Work, (b) the performance of the Construction Work, (c) the actions of Landlord, its contractors or agents in connection with the performance of the Construction Work, or (d) any inconvenience or annoyance occasioned by the performance of the Construction Work. Tenant shall give Landlord prior notice before Tenant receives a shipment at the dock-high loading and requires access to and through Unit B. Tenant shall be responsible for any increase in the cost of performing the Construction Work resulting from any act or omission of Tenant or its agents, employees, contractors. Additionally, if Landlord leases Unit B to another tenant during the Dock Access Period, Landlord may terminate Tenant's access to Unit B and use of the dock-high loading upon thirty (30) days' prior written notice to Tenant. Tenant shall remove the fencing before the end of the Dock Access Period or the earlier termination thereof, and repair any damage caused thereby.

(2)  Landlord shall, at Landlord's sole cost and expense, on a one-time basis only, split the power between the Premises and Unit B such that the Premises has 400 amps of power, and install bollards to protect the electrical panel (collectively, the "Landlord Work"), using Project standard materials, specifications, guidelines and procedures (except to the extent otherwise designated by Landlord). The exact scope and specifications for each element of the Landlord Work shall be determined by Landlord in its sole and absolute discretion. Landlord shall be permitted to perform the Landlord Work during Tenant's occupancy of the Premises, during normal business hours (or any hours), without any obligation to pay overtime or other premiums. Tenant shall not (and Tenant shall ensure that its contractors and agents do not) interfere in any way with the performance of the Landlord Work, and shall cooperate with Landlord in connection with the performance of the Landlord Work, including, without limitation, by moving any equipment and other property which Landlord or its contractor or agent may request be moved at Tenant's sole cost and expense. Landlord shall have no responsibility for, or for any reason be liable to Tenant for, and Tenant shall not be entitled to any compensation or damages for loss of the use of the whole or any part of the Premises or of Tenant's personal property or of Tenant's business arising from the performance of the Landlord Work, (b) the performance of the Landlord Work, (c) the actions of Landlord, its contractors or agents in connection with the performance of the Landlord Work, or (d) any inconvenience or annoyance occasioned by the performance of the Landlord Work. Tenant shall be responsible for any increase in the cost of performing the Landlord Work resulting from any act or omission of Tenant or its agents, employees, contractors. In addition, should Tenant request any change in the scope of the Landlord Work, then Tenant shall be responsible for all costs and expenses incurred by Landlord in connection therewith (payable upon demand); provided, however, Landlord shall have no obligation to change the scope of the Landlord Work (and any election to do so shall be in Landlord's sole and absolute discretion).

C.  Compliance. Except as provided in Section 7.B below, in no event shall Landlord have any obligation for any defects in the Premises, its non-compliance with Legal Requirements, or any limitation on its use. If the Legal Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Material, or other physical modification of the Premises and/or Building ("Capital Expenditure"), Landlord and Tenant shall allocate the cost of such work as follows:

(1)  Subject to subsection (3) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Tenant as compared with uses by tenants in general, Tenant shall be fully responsible for the cost thereof.

(2)  If such Capital Expenditure is not the result of the specific and unique use of the Premises by Tenant (such as, governmentally mandated seismic modifications), then Landlord shall pay for such Capital Expenditure and Tenant shall only be obligated to pay, each month during the remainder of the term of this Lease (including any extensions or renewals thereof), on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Tenant shall pay interest of ten percent (10%) per annum on the unamortized balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Landlord reasonably determines that it is not economically feasible or is commercially impracticable to pay its share thereof, Landlord shall have the option to terminate this Lease upon 90 days prior written notice to Tenant unless Tenant notifies Landlord, in writing, within 10 days after receipt of Landlord's termination notice that Tenant will pay for the entire cost of such Capital Expenditure in immediately available funds.

INITIALS

N.    **Guarantor:**    None.

O.    **Exhibits:**    Exhibit "A" - Site Plan Depicting the Premises and Project; Exhibit "B" - Rules and Regulations; Exhibit "C" – Tenant Contact Information Form; Exhibit "D" – ACM Notification.

P.    **Addenda:**    None.

2.    **Granting and Acceptance of Premises.**

A.    **Grant of Premises and Term.** In consideration of the obligation of Tenant to pay Rent (as defined below) as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease. Base Rent set forth in this Lease is not subject to adjustment should the actual size of the Premises be determined to be different than the approximate size described in the Basic Lease provisions. In the event that the size of the Premises and/or the Project are modified during the Lease Term, Landlord may recalculate Tenant's Share to reflect such modification.

B.    **Condition.** This Lease is being executed in accordance with the Purchase Agreement, whereby pursuant thereto, Seller sold the Project to Landlord. Tenant, together with Seller, have been in occupancy of the Premises prior to the Commencement Date, is intimately familiar with the Premises, and occupies the Premises in its as-is, where-is condition without any representation or warranty of any kind from Landlord, and agrees that except for the Landlord Work (defined below), Landlord shall have no obligation to perform any work, construct any improvements, make any repairs or perform any maintenance to the Premises as a condition to this Lease. Accordingly, Tenant has accepted the Premises in its condition as of the Commencement Date, AS-IS AND WITH ALL ITS FAULTS, subject to all applicable Legal Requirements. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. Tenant is advised to verify the actual size prior to executing this Lease. Tenant acknowledges that it has had the opportunity to inspect the suitability of the Premises for Tenant's intended use (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with any building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Legal Requirements**"), including the Americans with Disabilities Act), and to measure the Premises. Tenant acknowledges that the Premises may contain unpermitted improvements and, notwithstanding anything to the contrary in this Lease, Tenant shall be solely responsible for the cost of remediating and/or obtaining proper permits for such improvements to the extent required by the municipal agency(ies) with authority to so require. **NOTE: Tenant is responsible for determining whether or not the Legal Requirements, and, including, without limitation, the zoning, are appropriate for Tenant's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** Tenant represents and warrants that it has obtained all required occupancy permits from the applicable municipality and other agencies having jurisdiction over the Premises. No later than 10 days after written demand is made therefor by Landlord of Tenant, Tenant shall execute and deliver to Landlord a Tenant Contact Information Sheet in the form of Exhibit 'C', as attached to and hereby made a part of this Lease. Without limitation of the foregoing, Landlord makes no warranty as to (a) the heating, ventilating and air conditioning systems ("HVAC") serving the Premises, and (b) the existing electrical, plumbing, fire sprinkler, lighting, loading doors, sump pumps, if any, and all other such Building systems serving the Premises. No person acting on behalf of Landlord is authorized to make, and Tenant acknowledges and agrees that Landlord has not made and specifically negates and disclaims, any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to the Premises.

(1)    Notwithstanding the foregoing, Tenant shall have temporary use of the existing dock-high loading at the Building, as shown on the Site Plan attached hereto as Exhibit "A", for a period of 90 days following the Commencement Date (the "**Dock Access Period**"). In connection with the dock-high loading, Tenant shall have temporary access through the neighboring unit ("**Unit B**") to access the dock-high loading during the Dock Access Period. Prior to using the dock-high loading or accessing the dock-high loading through Unit B, Tenant, at its sole cost and expense, shall be responsible for constructing fencing that creates a path of travel for Tenant's ingress and egress through Unit B to the dock-high loading, the location of which shall be subject to Landlord's prior written approval, and the fencing shall be constructed in accordance with all applicable Legal Requirements. Furthermore, Tenant acknowledges and understands that Landlord plans to perform certain construction work to the Building and Unit B (the "**Construction Work**") during the Dock Access Period. Tenant shall not (and Tenant shall ensure that its contractors and agents do not) interfere in any way with the performance of the Construction Work, and shall cooperate with Landlord in connection with the performance of the Construction Work, including, without limitation, not obstructing access to Unit B while the Construction Work is being performed. Landlord shall have no responsibility for, or for any reason be liable to Tenant for, and Tenant shall not be entitled to any compensation or damages for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from, (a) any direct or indirect injury to or interference with Tenant's business arising from the performance of the Construction Work, (b) the performance of the Construction Work, (c) the actions of Landlord, its contractors or agents in connection with the performance of the Construction Work, or (d) any inconvenience or annoyance occasioned by the performance of the Construction Work. Tenant shall give Landlord prior notice before Tenant receives a shipment at the dock-high loading and requires access to and through Unit B. Tenant shall be responsible for any increase in the cost of performing the Construction Work resulting from any act or omission of Tenant or its agents, employees, contractors. Additionally, if Landlord leases Unit B to another tenant during the Dock Access Period, Landlord may terminate Tenant's access to Unit B and use of the dock-high loading upon thirty (30) days' prior written notice to Tenant. Tenant shall remove the fencing before the end of the Dock Access Period or the earlier termination thereof, and repair any damage caused thereby.

(2)    Landlord shall, at Landlord's sole cost and expense, on a one-time basis only, split the power between the Premises and Unit B such that the Premises has 400 amps of power, and install bollards to protect the electrical panel (collectively, the "**Landlord Work**"), using Project standard materials, specifications, guidelines and procedures (except to the extent otherwise designated by Landlord). The exact scope and specifications for each element of the Landlord Work shall be determined by Landlord in its sole and absolute discretion. Landlord shall be permitted to perform the Landlord Work during Tenant's occupancy of the Premises, during normal business hours (or any hours), without any obligation to pay overtime or other premiums. Tenant shall not (and Tenant shall ensure that its contractors and agents do not) interfere in any way with the performance of the Landlord Work, and shall cooperate with Landlord in connection with the performance of the Landlord Work, including, without limitation, by moving any equipment and other property which Landlord or its contractor or agent may request be moved at Tenant's sole cost and expense. Landlord shall have no responsibility for, or for any reason be liable to Tenant for, and Tenant shall not be entitled to any compensation or damages for loss of the use of the whole or any part of the Premises or of Tenant's personal property or improvements resulting from, (a) any direct or indirect injury to or interference with Tenant's business arising from the performance of the Landlord Work, (b) the performance of the Landlord Work, (c) the actions of Landlord, its contractors or agents in connection with the performance of the Landlord Work, or (d) any inconvenience or annoyance occasioned by the performance of the Landlord Work. Tenant shall be responsible for any increase in the cost of performing the Landlord Work resulting from any act or omission of Tenant or its agents, employees, contractors. In addition, should Tenant request any change in the scope of the Landlord Work, then Tenant shall be responsible for all costs and expenses incurred by Landlord in connection therewith (payable upon demand); provided, however, Landlord shall have no obligation to change the scope of the Landlord Work (and any election to do so shall be in Landlord's sole and absolute discretion).

C.    **Compliance.** Except as provided in Section 7.B below, in no event shall Landlord have any obligation for any defects in the Premises, its non-compliance with Legal Requirements, or any limitation on its use. If the Legal Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Material, or other physical modification of the Premises and/or Building ("**Capital Expenditure**"), Landlord and Tenant shall allocate the cost of such work as follows:

(1)    Subject to subsection (3) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Tenant as compared with uses by tenants in general, Tenant shall be fully responsible for the cost thereof.

(2)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Tenant (such as, governmentally mandated seismic modifications), then Landlord shall pay for such Capital Expenditure and Tenant shall only be obligated to pay, each month during the remainder of the term of this Lease (including any extensions or renewals thereof), on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Tenant shall pay interest of ten percent (10%) per annum on the unamortized balance but may prepay its obligation at any time, if, however, such Capital Expenditure is required during the last 2 years of this Lease or if Landlord reasonably determines that it is not economically feasible or is commercially impracticable to pay its share thereof, Landlord shall have the option to terminate this Lease upon 90 days prior written notice to Tenant unless Tenant notifies Landlord, in writing, within 10 days after receipt of Landlord's termination notice that Tenant will pay for the entire cost of such Capital Expenditure in immediately available funds.

4013376.8
24396-991

INITIALS

(3)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Legal Requirements. If the Capital Expenditures are instead triggered by Tenant as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then Tenant shall either: (a) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (b) following Landlord's written demand, complete such Capital Expenditure at its own expense. Tenant shall not have any right to terminate this Lease in accordance with this Section.

D.    **Tenant as Prior Owner/Occupant.** The warranties made by Landlord in Section 2.B, if any, are of no force or affect as previously Tenant was the owner or occupant of the Premises.  All other covenants and agreements in this Section shall be fully effective notwithstanding the fact that Tenant was the immediate prior owner or occupant of the Premises.

3.    **Common Areas.**

A.    **Common Areas.** "Common Areas" shall mean all areas of the Project for the common use or benefit of the tenants of the Project and their employees, agents, and other invitees, including, without limitation: all parking areas, pedestrian walkways, driveways and access roads, and entrances and exits.

B.    **Common Areas - Tenant's Rights.** Landlord grants to Tenant, for the benefit of Tenant and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Landlord under the terms hereof or under the terms of any Rules and Regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property (including, without limitation, pallets), temporarily or permanently, in the Common Areas, nor shall Tenant conduct any business from the Common Areas at any time, including without limitation, loading or unloading materials or supplies within or from the Common Areas (unless Landlord has designated loading areas within such Common Areas). Any such storage shall be permitted only by the prior written consent of Landlord, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

C.    **Common Areas - Rules and Regulations.** Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project.  The current Project Rules and Regulations are attached hereto as Exhibit "B." In the event of any conflict between said Rules and Regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control.  Landlord shall not have any liability or obligation for the breach of any Rules or Regulations by other tenants in the Project. Tenant shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Tenant will make use of all of the Common Areas (including, without limitation, all loading and unloading areas) in a cooperative, harmonious fashion, and shall not block or unreasonably interfere with access by others in the Project to their premises or loading areas.

D.    **Common Areas – Changes.** Landlord shall have the right, in the Landlord's sole discretion, from time to time, to make changes to the Project, including, without limitation, granting easements, making public dedications, designating and modifying Common Areas and creating restrictions on or about the Project; changing the location, size, shape and number of driveways, entrances, parking spaces and the number of assigned parking spaces proportionately if reduced or reallocated at the Project, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways; temporarily closing any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available; designating other land outside the boundaries of the Project to be a part of the Common Areas; adding additional buildings and improvements to the Common Areas; using the Common Areas while making additional improvements, repairs or alterations to the Project, and performing such other acts and making such other changes in, to or with respect to the Common Areas and Project as Landlord may deem to be appropriate.

E.    **Vehicle Parking.** Tenant shall be entitled to use only the number of Parking Spaces specified in the Basic Lease Provisions on those portions of the Common Areas designated from time to time by Landlord for parking. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "Permitted Size Vehicles." Landlord may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in this Lease. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Landlord. The parking areas of the property shall be used for parking of Permitted Size Vehicles only and, subject to Landlord's rules and regulations, the loading and unloading of trucks only. The use by Tenant of those areas for storage material (including pallets) is expressly prohibited.  All material shall be stored within the Building. Landlord may allocate and assign parking spaces among Tenant and other tenants in the Project if Landlord reasonably determines that such parking facilities are becoming crowded.  Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. In addition:

(1)    Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.

(2)    Tenant shall not service or store any vehicles in the Common Areas.

(3)    Tenant shall not park any vehicles overnight in the Parking Spaces, the Common Areas, or anywhere else in the Project; provided, however, subject to Tenant complying with all Legal Requirements and not interfering with any ingress, egress and/or access of any other occupants or tenants of the Project, Tenant may, on an infrequent basis, park a limited number of its and its employees' personal vehicles overnight in those areas designated by Landlord from time to time (provided that in no event shall Landlord have any liability for the safety or security of such vehicles, and Tenant and its employees shall assume any and all risk in connection with same).

(4)    If Tenant permits or allows any of the prohibited activities described in this Section, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

4.    **Rent.**

A.    **Rent Defined.** Any payments or charges due from Tenant (other than the Security Deposit) to Landlord hereunder shall be considered rent for all purposes of this Lease ("Rent").

B.    **Operating Expenses.** During each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as estimated by Landlord from time to time, of Tenant's Share of all Operating Expenses for the Project. Payments thereof for any fractional calendar month shall be prorated. The term "Operating Expenses" means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to, costs of any of the following if at the Project:

(1)    Costs relating to the operation, replacement, repair and maintenance, in neat, clean, good order and condition, of any of following if incurred by Landlord:

(a)    The Common Areas and Common Area Improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

(b)    Exterior signs and any tenant directories.

(c)    Any fire sprinkler systems.

(d)    All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(2)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(3)    The cost of pest control services, property management, security services, owner's association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(4)    The cost of trash disposal for any trash receptacles located in the Common Areas and/or available for the use of tenants

4013376.8
24396-991

INITIALS

(3)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Legal Requirements. If the Capital Expenditures are instead triggered by Tenant as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then Tenant shall either: (a) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (b) following Landlord's written demand, complete such Capital Expenditure at its own expense. Tenant shall not have any right to terminate this Lease in accordance with this Section.

D.    **Tenant as Prior Owner/Occupant.** The warranties made by Landlord in Section 2.B, if any, are of no force or effect as previously Tenant was the owner or occupant of the Premises. All other covenants and agreements in this Section shall be fully effective notwithstanding the fact that Tenant was the immediate prior owner or occupant of the Premises.

3.    **Common Areas.**

A.    **Common Areas.** "Common Areas" shall mean all areas of the Project for the common use or benefit of the tenants of the Project and their employees, agents, and other invitees, including, without limitation: all parking areas, pedestrian walkways, driveways and access roads, and entrances and exits.

B.    **Common Areas - Tenant's Rights.** Landlord grants to Tenant, for the benefit of Tenant and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Landlord under the terms hereof or under the terms of any Rules and Regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property (including, without limitation, pallets), temporarily or permanently, in the Common Areas, nor shall Tenant conduct any business from the Common Areas at any time, including without limitation, loading or unloading materials or supplies within or from the Common Areas (unless Landlord has designated loading areas within such Common Areas). Any such storage shall be permitted only by the prior written consent of Landlord, which consent may be revoked at any time. In the event that any unauthorized storage shall occur, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

C.    **Common Areas - Rules and Regulations.** Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project. The current Project Rules and Regulations are attached hereto as Exhibit "B." In the event of any conflict between said Rules and Regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any Rules or Regulations by other tenants in the Project. Tenant shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Tenant will make use of all of the Common Areas (including, without limitation, all loading and unloading areas) in a cooperative, harmonious fashion, and shall not block or unreasonably interfere with access by others in the Project to their premises or loading areas.

D.    **Common Areas – Changes.** Landlord shall have the right, in the Landlord's sole discretion, from time to time, to make changes to the Project, including, without limitation, granting easements, making public dedications, designating and modifying Common Areas and creating restrictions on or about the Project; changing the location, size, shape and number of driveways, entrances, parking spaces and the number of assigned parking spaces proportionately if reduced or reallocated at the Project, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways; temporarily closing any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available; designating other land outside the boundaries of the Project to be a part of the Common Areas; adding additional buildings and improvements to the Common Areas; using the Common Areas while making additional improvements, repairs or alterations to the Project; and performing such other acts and making such other changes in, to or with respect to the Common Areas and Project as Landlord may deem to be appropriate.

E.    **Vehicle Parking.** Tenant shall be entitled to use only the number of Parking Spaces specified in the Basic Lease Provisions on those portions of the Common Areas designated from time to time by Landlord for parking. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "**Permitted Size Vehicles.**" Landlord may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in this Lease. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Landlord. The parking areas of the property shall be used for parking of Permitted Size Vehicles only. The use by Tenant of those areas for storage material (including pallets) is expressly prohibited. All material shall be stored within the Building. Landlord may allocate and assign parking spaces among Tenant and other tenants in the Project if Landlord reasonably determines that such parking facilities are becoming crowded. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. In addition:

(1)    Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.

(2)    Tenant shall not service or store any vehicles in the Common Areas.

(3)    Tenant shall not park any vehicles overnight in the Parking Spaces, the Common Areas, or anywhere else in the Project; provided, however, subject to Tenant complying with all Legal Requirements and not interfering with any ingress, egress and/or access of any other occupants or tenants of the Project, Tenant may, on an infrequent basis, park a limited number of its and its employees' personal vehicles overnight in those areas designated by Landlord from time to time (provided that in no event shall Landlord have any liability for the safety or security of such vehicles, and Tenant and its employees shall assume any and all risk in connection with same).

(4)    If Tenant permits or allows any of the prohibited activities described in this Section, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

4.    **Rent.**

A.    **Rent Defined.** Any payments or charges due from Tenant (other than the Security Deposit) to Landlord hereunder shall be considered rent for all purposes of this Lease ("**Rent**").

B.    **Operating Expenses.** During each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as estimated by Landlord from time to time, of Tenant's Share of all Operating Expenses for the Project. Payments thereof for any fractional calendar month shall be prorated. The term "**Operating Expenses**" means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to, costs of any of the following if at the Project:

(1)    Costs relating to the operation, replacement, repair and maintenance, in neat, clean, good order and condition, of any of following if incurred by Landlord:

(a)    The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

(b)    Exterior signs and any tenant directories.

(c)    Any fire sprinkler systems.

(d)    All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(2)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(3)    The cost of pest control services, property management, security services, owner's association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(4)    The cost of trash disposal for any trash receptacles located in the Common Areas and/or available for the use of tenants

4013376.8
24396-991

INITIALS

(if Landlord operates the Project in a manner such that tenants do not directly contract for trash collection services).

(5)    Reserves set aside for maintenance and repair of Common Areas and Common Area equipment.

(6)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

(7)    Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(8)    The cost of any capital improvement (as opposed to maintenance, repair or replacements) to the Building or the Project not covered under the provisions of Section 2.C; provided, however, that Landlord shall allocate the cost of any such capital improvement over a 12 year period and Tenant shall not be required to pay more than Tenant's Share of 1/144th of the cost of such capital improvement in any given month.

(9)    The cost of any other services to be provided by Landlord that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(10)    Real Property Taxes (as defined in Section 10.A below).

(11)    The cost of the premiums for the insurance policies carried by Landlord pursuant to Section 8 below.

Any Operating Expenses and Real Property Taxes that are specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building. Notwithstanding any contrary provision contained in this Lease, Landlord shall have the right, from time to time, to equitably allocate some or all of the Operating Expenses for the Project into separate cost pools as described below (the "Operating Expense Pools"), in Landlord's sole discretion. If any line item(s) of Tenant's Share of Operating Expenses are incurred or assessed with respect to a portion of the Project that includes the Premises but does not include the entire Project, the denominator for the purpose of calculating Tenant's Share of the applicable line item(s) of Tenant's Share of Operating Expenses will be adjusted to exclude the square footage of the portions of the Project to which such line item(s) do not relate, thereby creating separate Operating Expense Pools and different Tenant's Shares with respect to each such Operating Expense Pool.  Each Operating Expense Pool denominator and, consequently, Tenant's Share, shall be subject to modification each year of the Lease Term, as reasonably determined by Landlord.

Within sixty (60) days after written request (but not more than once each year) Landlord shall deliver to Tenant a reasonably detailed statement showing Tenant's Share of the actual Operating Expenses for the preceding year. If Tenant's payments during such year exceed Tenant's Share, Landlord shall credit the amount of such over-payment against Tenant's future payments of Operating Expenses.  If Tenant's payments during such year were less than Tenant's Share, Tenant shall pay to Landlord the amount of the deficiency within 10 days after delivery by Landlord to Tenant of the statement. Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Landlord is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

C.    Payment. Tenant shall pay Base Rent in the amount set forth in the Basic Lease Provisions of this Lease. The Total Amount Due on the Commencement Date, as shown in Section 1.J, shall be due and payable on the day prior to the Commencement Date, paid through Escrow (as defined in the Purchase Agreement), and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Rent on or before the first day of each calendar month succeeding the Commencement Date.  Payments of Base Rent and estimated Operating Expenses for any fractional calendar month shall be prorated based on the actual days of said month.  At least one (1) day prior to the Commencement Date, Tenant shall pay through Escrow all Rent for one (1) full calendar month, plus, if the Commencement Date is not the first day of a calendar month, the prorated amount of Rent applicable to the month in which the Commencement Date occurs.  Except for the payment made as of the Commencement Date, all payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made by check or by Electronic Fund Transfer ("EFT") of immediately available federal funds before 5:00 p.m., Pacific Time at such place, as Landlord may from time to time designate to Tenant in writing.  The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations.  Tenant shall have no right at any time to abate, reduce, or set-off any Rent due hereunder except as may be expressly provided in this Lease.  If Tenant is delinquent in any monthly installment of Base Rent or of estimated Operating Expenses for more than 5 days after the due date, Tenant shall pay to Landlord on demand a late charge equal to the greater of ten percent (10%) of such delinquent sum or $100.  The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

5.    Security Deposit.  The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease. If Tenant fails to pay Rent, or otherwise an Event of Default occurs under this Lease, Landlord may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Landlord, for Rents which will be due in the future, and/or to reimburse or compensate Landlord for any liability, expense, loss or damage which Landlord may suffer or incur by reason thereof. If Landlord uses or applies all or any portion of the Security Deposit, Tenant shall within 10 days after written request therefor deposit monies with Landlord sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Tenant shall, upon written request from Landlord, deposit additional monies with Landlord so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Permitted Use be amended to accommodate a material change in the business of Tenant or to accommodate a sublessee or assignee, Landlord shall have the right to increase the Security Deposit to the extent necessary, in Landlord's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. Landlord may use, apply or retain all or any portion of the Security Deposit (a) first, for Tenant's repair obligations, including without limitation, the obligation to restore the Premises to the condition required under this Lease, (b) second, to the payment of any rent or other sum in default or for the payment of any other sum to which Tenant may become obligated by reason of Tenant's default, and (c) third, to compensate Landlord for any loss or damage which Landlord may suffer thereby. If a change in control of Tenant occurs during this Lease and following such change the financial condition of Tenant is, in Landlord's reasonable judgment, significantly reduced, Tenant shall deposit such additional monies with Landlord as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Landlord shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease and the satisfaction of all obligations of Tenant hereunder, Landlord shall return that portion of the Security Deposit not used or applied by Landlord. Landlord shall upon written request provide Tenant with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Tenant under this Lease (including, without limitation, Base Rent). Tenant hereby waives California Civil Code Section 1950.7, and all other provisions of law, now or hereafter in force, which may provide that Landlord can claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums reasonably necessary to compensate Landlord for any other loss or damage, foreseeable or unforeseeable, caused by the act or omission of Tenant or any officer, employee or agent of Tenant.

6.    Use; Hazardous Materials; Compliance.

A.    Use.  Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose.  Tenant shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.

B.    Hazardous Materials.

(1)    Reportable Uses Require Consent.  Except for (a) Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, (b) propane used in Tenant's forklifts in the normal course of its business, and (c) Hazardous Materials contained in products stored and/or distributed during Tenant's normal course of business in their original, sealed, and unopened containers, Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Materials in or about the Premises without Landlord's prior written consent.  The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, permits, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following:  the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder.  The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).  As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom. No cure or

4013376.8
24396-991

INITIALS

(if Landlord operates the Project in a manner such that tenants do not directly contract for trash collection services).

(5)    Reserves set aside for maintenance and repair of Common Areas and Common Area equipment.

(6)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

(7)    Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(8)    The cost of any capital improvement (as opposed to maintenance, repair or replacements) to the Building or the Project not covered under the provisions of Section 2.C; provided, however, that Landlord shall allocate the cost of any such capital improvement over a 12 year period and Tenant shall not be required to pay more than Tenant's Share of 1/144th of the cost of such capital improvement in any given month.

(9)    The cost of any other services to be provided by Landlord that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(10)    Real Property Taxes (as defined in Section 10.A below).

(11)    The cost of the premiums for the insurance policies carried by Landlord pursuant to Section 8 below.

Any Operating Expenses and Real Property Taxes that are specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building. Notwithstanding any contrary provision contained in this Lease, Landlord shall have the right, from time to time, to equitably allocate some or all of the Operating Expenses for the Project into separate cost pools as described below (the "Operating Expense Pools"), in Landlord's sole discretion. If any line item(s) of Tenant's Share of Operating Expenses are incurred or assessed with respect to a portion of the Project that includes the Premises but does not include the entire Project, the denominator for the purpose of calculating Tenant's Share of the applicable line item(s) of Tenant's Share of Operating Expenses will be adjusted to exclude the square footage of the portions of the Project to which such line item(s) do not relate, thereby creating separate Operating Expense Pools and different Tenant's Shares with respect to each such Operating Expense Pool. Each Operating Expense Pool denominator and, consequently, Tenant's Share, shall be subject to modification each year of the Lease Term, as reasonably determined by Landlord.

Within sixty (60) days after written request (but not more than once each year) Landlord shall deliver to Tenant a reasonably detailed statement showing Tenant's Share of the actual Operating Expenses for the preceding year. If Tenant's payments during such year exceed Tenant's Share, Landlord shall credit the amount of such over-payment against Tenant's future payments of Operating Expenses. If Tenant's payments during such year were less than Tenant's Share, Tenant shall pay to Landlord the amount of the deficiency within 10 days after delivery by Landlord to Tenant of the statement. Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Landlord is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

C.    Payment. Tenant shall pay Base Rent in the amount set forth in the Basic Lease Provisions of this Lease. The Total Amount Due on the Commencement Date, as shown in Section 1.J, shall be due and payable on the day prior to the Commencement Date, paid through Escrow (as defined in the Purchase Agreement), and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Rent on or before the first day of each calendar month succeeding the Commencement Date. Payments of Base Rent and estimated Operating Expenses for any fractional calendar month shall be prorated based on the actual days of said month. At least one (1) day prior to the Commencement Date, Tenant shall pay through Escrow all Rent for one (1) full calendar month, plus, if the Commencement Date is not the first day of a calendar month, the prorated amount of Rent applicable to the month in which the Commencement Date occurs. Except for the payment made as of the Commencement Date, all payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made by check or by Electronic Fund Transfer ("EFT") of immediately available federal funds before 5:00 p.m., Pacific Time at such place, as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any Rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or of estimated Operating Expenses for more than 5 days after the due date, Tenant shall pay to Landlord on demand a late charge equal to the greater of ten percent (10%) of such delinquent sum or $100. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

5.    Security Deposit. The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease. If Tenant fails to pay Rent, or otherwise an Event of Default occurs under this Lease, Landlord may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Landlord, for Rents which will be due in the future, and/or to reimburse or compensate Landlord for any liability, expense, loss or damage which Landlord may suffer or incur by reason thereof. If Landlord uses or applies all or any portion of the Security Deposit, Tenant shall within 10 days after written request therefor deposit monies with Landlord sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Tenant shall, upon written request from Landlord, deposit additional monies with Landlord so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Permitted Use be amended to accommodate a material change in the business of Tenant or to accommodate a sublessee or assignee, Landlord shall have the right to increase the Security Deposit to the extent necessary, in Landlord's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. Landlord may use, apply or retain all or any portion of the Security Deposit (a) first, for Tenant's repair obligations, including without limitation, the obligation to restore the Premises to the condition required under this Lease, (b) second, to the payment of any rent or other sum in default or for the payment of any other sum to which Tenant may become obligated by reason of Tenant's default, and (c) third, to compensate Landlord for any loss or damage which Landlord may suffer thereby. If a change in control of Tenant occurs during this Lease and following such change the financial condition of Tenant is, in Landlord's reasonable judgment, significantly reduced, Tenant shall deposit such additional monies with Landlord as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Landlord shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease and the satisfaction of all obligations of Tenant hereunder, Landlord shall return that portion of the Security Deposit not used or applied by Landlord. Landlord shall upon written request provide Tenant with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Tenant under this Lease (including, without limitation, Base Rent). Tenant hereby waives California Civil Code Section 1950.7, and all other provisions of law, now or hereafter in force, which may provide that Landlord can claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums reasonably necessary to compensate Landlord for any other loss or damage, foreseeable or unforeseeable, caused by the act or omission of Tenant or any officer, employee or agent of Tenant.

6.    Use; Hazardous Materials; Compliance.

A.    Use. Tenant shall use and occupy the Premises only for the Permitted Use, and for no other purpose. Tenant shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.

B.    Hazardous Materials.

(1)    Reportable Uses Require Consent. Except for (a) Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, (b) propane used in Tenant's forklifts in the normal course of its business, and (c) Hazardous Materials contained in products stored and/or distributed during Tenant's course of business in their original, sealed, and unopened containers, Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Materials in or about the Premises without Landlord's prior written consent. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, permits, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom. No cure or

4013376.8
24396-991

INITIALS

grace period provided in this Lease shall apply to Tenant's obligations to comply with the terms and conditions of this Section.

(3)    **Duty to Inform Landlord.** If Tenant knows, or has reasonable cause to believe, that a Hazardous Material has come to be located in, on, under or about the Premises, other than as previously consented to by Landlord, Tenant shall immediately give written notice of such fact to Landlord, and provide Landlord with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Material.

(3)    **Tenant Remediation.** Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall investigate, mitigate and remediate in a manner satisfactory to Landlord any Hazardous Materials introduced or released on or from the Premises (other than by Landlord or Landlord's agents), and/or from the Project by Tenant, the business operated by Tenant or Tenant's father, Tenant's agents, employees, contractors, subtenants, licensees, or invitees, whether before or during the Lease Term. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Project.

(4)    **Tenant Indemnification for Hazardous Materials and Limitation of Liability.** Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section by Tenant, its agents, employees, contractors, subtenants, assignees, licensees, or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Section shall survive any termination of this Lease. Notwithstanding anything to the contrary in this subsection, Tenant shall have no liability of any kind to Landlord as to Hazardous Materials on the Premises (a) caused by Landlord or its agents; or (b) present at the Premises prior to the date Tenant took occupancy of the Premises, unless disturbed by Tenant in violation of this Lease.

(5)    **Investigations and Remediation.** Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. In addition, Tenant shall provide to Landlord copies of all material safety data sheets (MSDS) for Hazardous Materials used, handled, stored, or generated at the Premises prior to the Commencement Date, with regular updates if and when necessary to reflect current use, handling, storage or generation on such form as Landlord may require.

(6)    **Landlord Termination Option.** If a condition involving the presence of, or a contamination by, a Hazardous Material at the Premises that requires remediation (a "Hazardous Material Condition") occurs or is discovered during the Lease Term and is not Tenant's responsibility under this Lease or the Legal Requirements (in which case Tenant shall make the investigation and remediation thereof required by this Lease and/or the Legal Requirements and this Lease shall continue in full force and effect, but subject to Landlord's rights under Section 6.B(4) and Section 9), and if Landlord elects to remediate such condition and the estimated cost therefor exceeds 12 times the then monthly Base Rent or $100,000, whichever is less, Landlord may, at Landlord's sole discretion, give written notice to Tenant of Landlord's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Landlord elects to give a termination notice, Tenant may, within 10 days thereafter, give written notice to Landlord of Tenant's commitment to pay the amount by which the cost of the remediation of such Hazardous Material Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is less. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Landlord shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Tenant does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Landlord's notice of termination.

C.    **Tenant's Compliance with Legal Requirements.** Except as otherwise provided in this Lease, Tenant shall, at Tenant's sole expense and regardless of the cost therefor or the time remaining on the Lease Term, fully, diligently and in a timely manner, materially comply with all Legal Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Landlord's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Legal Requirements are now in effect or become effective after the date of this Lease. Tenant shall, within 10 days after receipt of Landlord's written request, provide Landlord with copies of all permits, licenses (including but not limited to a valid business license) and other documents, and other information evidencing Tenant's compliance with any Legal Requirements specified by Landlord, and shall immediately upon receipt, notify Landlord in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Tenant or the Premises to comply with any Legal Requirements. Likewise, Tenant shall immediately give written notice to Landlord of: (a) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold, or (b) any mustiness or other odors that might indicate the presence of mold in the Premises.

D.    **Inspection; Compliance.** Landlord and Landlord's "Lender" (as defined in Section 29) and consultants shall have the right to enter into the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Tenant with this Lease. The cost of any such inspections shall be paid by Landlord, unless a violation of the Purchase Agreement, this Lease, Legal Requirements or Environmental Requirements is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Tenant shall upon request reimburse Landlord for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.

7.    **Maintenance; Repairs; Trade Fixtures and Tenant-Made Alterations.**

A.    **Tenant's Obligations.**

(1)    **In General.** Subject to the provisions of Sections 2.B (Condition), 2.C (Compliance), 6.C (Tenant's Compliance with Legal Requirements), 7.B (Landlord's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Tenant shall, at Tenant's sole expense, keep the Premises and Tenant-Made Alterations in good order, condition and repair including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, ceilings, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, loading doors and skylights but excluding any items which are the responsibility of Landlord pursuant to Section 7.B. Tenant, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts below. Tenant's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Any and all repairs shall be subject to the terms and conditions of Section 7.C below.

(2)    **Service Contracts.** Tenant shall, at Tenant's sole expense, procure and maintain contracts, with copies to Landlord, in customary form and substance for HVAC equipment, boiler and pressure vessels, clarifiers, janitorial and trash removal services, and with qualified and experienced contractors. However, Landlord reserves the right, upon notice to Tenant, to procure and maintain any or all of such service contracts, and Tenant shall reimburse Landlord, upon demand, for the cost thereof. The contract for HVAC maintenance shall be performed by a licensed and qualified HVAC contractor, and a copy of the contract must be provided to Landlord upon occupancy of the Premises. The service contract must become effective within 30 days of occupancy, and service visits shall be performed on a quarterly basis.

(3)    **Failure to Perform.** If Tenant fails to perform Tenant's obligations under this Section, Landlord may enter upon the Premises after 10 days' prior written notice to Tenant (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Tenant's behalf, and put the Premises in good order, condition and repair, and Tenant shall promptly pay to Landlord a sum equal to 115% of the cost thereof. Additionally, if at Tenant's request or consent, Landlord agrees to perform any maintenance and/or repair items which are otherwise Tenant's responsibility under this Lease, and pass through the cost of such maintenance and/or repair items to Tenant, Landlord shall have the right to apply a management fee up to 2% of the cost of any such maintenance and/or repair items, which shall be payable upon demand.

B.    **Landlord's Obligations.** Subject to the provisions of Sections 2.B (Condition), 2.C (Compliance), 4.B (Operating Expenses), 6

INITIALS

grace period provided in this Lease shall apply to Tenant's obligations to comply with the terms and conditions of this Section.

(2)    **Duty to Inform Landlord**. If Tenant knows, or has reasonable cause to believe, that a Hazardous Material has come to be located in, on, under or about the Premises, other than as previously consented to by Landlord, Tenant shall immediately give written notice of such fact to Landlord, and provide Landlord with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Material.

(3)    **Tenant Remediation**. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall investigate, mitigate and remediate in a manner satisfactory to Landlord any Hazardous Materials introduced or released on or from the Premises (other than by Landlord or Landlord's agents), and/or from the Project by Tenant, the business operated by Tenant or Tenant's father, Tenant's agents, employees, contractors, subtenants, licensees, or invitees, whether before or during the Lease Term.  Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Project

(4)    **Tenant Indemnification for Hazardous Materials and Limitation of Liability**. Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section by Tenant, its agents, employees, contractors, subtenants, assignees, licensees, or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Section shall survive any termination of this Lease. Notwithstanding anything to the contrary in this subsection, Tenant shall have no liability of any kind to Landlord as to Hazardous Materials on the Premises (a) caused by Landlord or its agents; or (b) present at the Premises prior to the date Tenant took occupancy of the Premises, unless disturbed by Tenant in violation of this Lease.

(5)    **Investigations and Remediation**. Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, as far as may be reasonable under the circumstances, any disturbance to Tenant's operations.  Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests.  Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. In addition, Tenant shall provide to Landlord copies of all material safety data sheets (MSDS) for Hazardous Materials used, handled, stored, or generated at the Premises prior to the Commencement Date, with regular updates if and when necessary to reflect current use, handling, storage or generation on such form as Landlord may require.

(6)    **Landlord Termination Option**. If a condition involving the presence of, or a contamination by, a Hazardous Material at the Premises that requires remediation (a "**Hazardous Material Condition**") occurs or is discovered during the Lease Term and is not Tenant's responsibility under this Lease or the Legal Requirements (in which case Tenant shall make the investigation and remediation thereof required by this Lease and/or the Legal Requirements and this Lease shall continue in full force and effect, but subject to Landlord's rights under Section 6.B(4) and Section 9), and if Landlord elects to remediate such condition and the estimated cost thereof exceeds 12 times the then monthly Base Rent or $100,000, whichever is less, Landlord may, at Landlord's sole discretion, give written notice to Tenant of Landlord's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Landlord elects to give a termination notice, Tenant may, within 10 days thereafter, give written notice to Landlord of Tenant's commitment to pay the amount by which the cost of the remediation of such Hazardous Material Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is less. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Landlord shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Tenant does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Landlord's notice of termination.

C.    **Tenant's Compliance with Legal Requirements**. Except as otherwise provided in this Lease, Tenant shall, at Tenant's sole expense and regardless of the cost thereof or the time remaining on the Lease Term, fully, diligently and in a timely manner, materially comply with all Legal Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Landlord's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Legal Requirements are now in effect or become effective after the date of this Lease. Tenant shall, within 10 days after receipt of Landlord's written request, provide Landlord with copies of all permits, licenses (including but not limited to a valid business license) and other documents, and other information evidencing Tenant's compliance with any Legal Requirements specified by Landlord, and shall immediately upon receipt, notify Landlord in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Tenant or the Premises to comply with any Legal Requirements. Likewise, Tenant shall immediately give written notice to Landlord of: (a) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold, or (b) any mustiness or other odors that might indicate the presence of mold in the Premises.

D.    **Inspection; Compliance**. Landlord and Landlord's "Lender" (as defined in Section 29) and consultants shall have the right to enter into the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Tenant with this Lease.  The cost of any such inspections shall be paid by Landlord, unless a violation of the Purchase Agreement, this Lease, Legal Requirements or Environmental Requirements is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Tenant shall upon request reimburse Landlord for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.

7.    **Maintenance; Repairs; Trade Fixtures and Tenant-Made Alterations.**

A.    **Tenant's Obligations**

(1)    **In General**. Subject to the provisions of Sections 2.B (Condition), 2.C (Compliance), 6.C (Tenant's Compliance with Legal Requirements), 7.B (Landlord's Obligations), 9 (Damage or Destruction), and 14 (Condemnation). Tenant shall, at Tenant's sole expense, keep the Premises and Tenant-Made Alterations in good order, condition and repair including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, loading doors and skylights but excluding any items which are the responsibility of Landlord pursuant to Section 7.B. Tenant, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts below. Tenant's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Any and all repairs shall be subject to the terms and conditions of Section 7.C below.

(2)    **Service Contracts**. Tenant shall, at Tenant's sole expense, procure and maintain contracts, with copies to Landlord, in customary form and substance for HVAC equipment, boiler and pressure vessels, clarifiers, janitorial and trash removal services, and with qualified and experienced contractors. However, Landlord reserves the right, upon notice to Tenant, to procure and maintain any or all of such service contracts, and Tenant shall reimburse Landlord, upon demand, for the cost thereof. The contract for HVAC maintenance shall be performed by a licensed and qualified HVAC contractor, and a copy of the contract must be provided to Landlord upon occupancy of the Premises. The service contract must become effective within 30 days of occupancy, and service visits shall be performed on a quarterly basis.

(3)    **Failure to Perform**. If Tenant fails to perform Tenant's obligations under this Section, Landlord may enter upon the Premises after 10 days' prior written notice to Tenant (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Tenant's behalf, and put the Premises in good order, condition and repair, and Tenant shall promptly pay to Landlord a sum equal to 115% of the cost thereof. Additionally, if at Tenant's request or agreement, Landlord agrees to perform any maintenance and/or repair items which are otherwise Tenant's responsibility under this Lease, and pass through the cost of such maintenance and/or repair items to Tenant, Landlord shall have the right to apply a management fee equal to 2% of the cost of any such maintenance and/or repair items, which shall be payable upon demand.

B.    **Landlord's Obligations**. Subject to the provisions of Sections 2.B (Condition), 2.C (Compliance), 4.B (Operating Expenses), 6

4013376.8
24396-991

Page 5 of 15

INITIALS

(Use; Hazardous Materials; Compliance), 7.A (Tenant's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Landlord shall, subject to reimbursement pursuant to Section 4.B, keep in good order, condition and repair the foundations, structural elements of the exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system (excluding fire sprinkler systems, if any, installed by or on behalf of Tenant, for which Tenant shall be responsible), Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof. Landlord shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Landlord be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Tenant expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease, including, without limitation, California Civil Code Sections 1941 and 1942, and any other statute providing a right to make repairs and deduct the cost thereof from the rent.

C.     Tenant-Made Alterations; Trade Fixtures. Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") during the Lease Term, which are interior, non-structural Tenant-Made Alterations shall be subject to Landlord's prior written consent, not to be unreasonably withheld, delayed or conditioned provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Project. Tenant shall have the right to perform interior, non-structural Tenant-Made Alterations which cost less than $5,000 per Alteration without obtaining Landlord's prior written consent, by providing a written notice of such Tenant-Made Alterations to Landlord containing sufficient and complete information regarding such Tenant-Made Alterations, provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Building, and provided further that it shall be the responsibility of Tenant to determine the applicability of Legal Requirements for any such Tenant-Made Alterations, including without limitation laws related to the presence of asbestos containing materials. Tenant shall not perform structural Tenant-Made Alterations without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion. Tenant shall give Landlord not less than 10 days' notice prior to the commencement of any work in, on or about the Premises. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Legal Requirements. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. For work which costs an amount in excess of one month's Base Rent, Landlord may condition its consent upon Tenant providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Tenant-Made Alteration and/or upon Tenant's posting an additional Security Deposit with Landlord. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by the removal of such Tenant-Made Alterations upon surrender of the Premises. Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, racking, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Tenant shall remove its Trade Fixtures and shall repair any damage caused by such removal upon surrender of the Premises.

Notwithstanding anything contained herein to the contrary but subject to the terms of the Purchase Agreement, Landlord shall contribute up to a maximum amount of $10,000.00 (the "TI Allowance"), towards the installation of a Duraramp in the Premises. Provided no breach has occurred and no Event of Default is ongoing, Landlord shall pay the TI Allowance to Tenant within sixty (60) days after the latest to occur of the following: (a) Tenant's written request for payment of the TI Allowance certifying completion of the initial Tenant-Made Alterations in accordance with the terms of this Lease, (b) Landlord's receipt of Tenant's invoice and reasonable supporting documentation substantiating the costs related thereto, (c) Landlord's receipt of final and unconditional lien waivers from all contractors and subcontractors who did work on the initial Tenant-Made Alterations, (d) Landlord's receipt of a copy of the final permit approved by the applicable governing authority to the extent required for such Tenant-Made Alterations, (e) delivery of any as-builts to Landlord in electronic or hard copy format as elected by Landlord, and (f) at Landlord's election, an estoppel certificate, executed by Tenant. Landlord shall be under no obligation to pay for any Tenant-Made Alterations to the Premises in excess of the TI Allowance. Further, such TI Allowance shall only be available for Tenant's use for six (6) months following the commencement Date and Tenant hereby waives any and all rights to any unused portion of the TI Allowance remaining as of the first day of the seventh (7th) month of the Lease Term. Subject to Tenant complying with the terms and conditions stated herein (including, without limitation, complying with all applicable Legal Requirements and Landlord's review of any detailed plans), Landlord hereby approves in concept only (but subject Landlord's other rights stated herein), Tenant situating the Duraramp along the exterior of the western wall of the Building, provided that such Duraramp and the use thereof shall not interfere with any ingress, egress or access by any other occupants or tenants of the Project.

(1)     Liens; Bonds. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 20 days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 20 day period.

(2)     Surrender; Restoration.  Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in broom-clean and good condition and repair (with all Tenant-Made Alterations (including, without limitation, any initial Tenant-Made Alterations), improvements and Trade Fixtures removed except as otherwise expressly agreed in writing by Landlord) ordinary wear and tear, casualty loss and condemnation covered by Sections 9 and 14 excepted and otherwise in accordance with this Section. Without limiting the foregoing, Tenant shall remove any odor which may exist in the Premises resulting from Tenant's occupancy of the Premises upon the termination of the Lease Term or earlier termination of Tenant's right of possession. Any Trade Fixtures, Tenant-Made Alterations, equipment, furniture, and other property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Rent, Operating Expenses and all obligations concerning the condition and repair of the Premises. Without limiting Tenant's obligations under this Lease, Tenant acknowledges that it shall have the affirmative obligation to remove all racking and floor striping from the Premises by or before the expiration or earlier termination of the Lease Term. As guidance to the parties, removal of the aforementioned racking shall include, without limitation, removal of the bolts in concrete associated therewith, all of which cut flush at the surface and pushed into the concrete one inch or more below the slab.  Tenant shall clean all resulting holes and shall fill the same with epoxy flush to the floor's surface. Tenant understands that the holes created for any anchor bolts placed by or on behalf of Tenant must be drilled one inch deeper than the length of the anchor bolts themselves to permit removal in the manner provided above. Furthermore, if Tenant places (or causes to be placed) any floor striping in the Premises, then following removal of any such floor striping (a) there shall be no residual staining or other indication that such striping existed and (b) Tenant must re-seal the floor with a sealant reasonably acceptable to Landlord. If Tenant elects to stripe the floor of the Premises, then Tenant shall utilize a floor striping material which can be removed and which will not permeate into the flooring. The foregoing does not constitute Landlord's consent to Tenant's placement of any racking and/or floor striping in the Premises, which placement shall be governed by the provision of this Lease. Additionally, without limiting Tenant's obligations under the Lease, Tenant acknowledges that it shall have the affirmative obligation to cause all office, warehouse, emergency and exit lights to be fully operational with all bulbs and ballasts functioning; all truck

4013376.8
24396-991


INITIALS

(Use; Hazardous Materials; Compliance), 7.A (Tenant's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Landlord shall, subject to reimbursement pursuant to Section 4.B, keep in good order, condition and repair the foundations, structural elements of the exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system (excluding the sprinkler systems, if any, installed by or on behalf of Tenant, for which Tenant shall be responsible), Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof. Landlord shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Landlord be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Tenant expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease, including, without limitation, California Civil Code Sections 1941 and 1942, and any other statute providing a right to make repairs and deduct the cost thereof from the rent.

C.    **Tenant-Made Alterations; Trade Fixtures.** Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") during the Lease Term, which are interior, non-structural Tenant-Made Alterations shall be subject to Landlord's prior written consent, not to be unreasonably withheld, delayed or conditioned provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Project. Tenant shall have the right to perform interior, non-structural Tenant-Made Alterations which cost less than $5,000 per Alteration without obtaining Landlord's prior written consent, by providing a written notice of such Tenant-Made Alterations to Landlord containing sufficient and complete information regarding such Tenant-Made Alterations, provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Building, and provided further that it shall be the responsibility of Tenant to determine the applicability of any Legal Requirements for any such Tenant-Made Alterations, including without limitation laws related to the presence of asbestos containing materials. Tenant shall not perform structural Tenant-Made Alterations without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion. Tenant shall give Landlord not less than 10 days' notice prior to the commencement of any work in, on or about the Premises. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Legal Requirements. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. For work which costs an amount in excess of one month's Base Rent, Landlord may condition its consent upon Tenant providing a lien and completion bond in an amount equal to 150% of the estimated cost of any Tenant-Made Alteration and/or upon Tenant's posting an additional Security Deposit with Landlord. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations, Tenant shall final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by the removal of such Tenant-Made Alterations upon surrender of the Premises. Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, racking, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Tenant shall remove its Trade Fixtures and shall repair any damage caused by such removal upon surrender of the Premises.

Notwithstanding anything contained herein to the contrary but subject to the terms of the Purchase Agreement, Landlord shall contribute up to a maximum amount of $10,000.00 (the "TI Allowance"), towards the installation of a Durararp as initial Tenant-Made Alterations to the Premises. Provided no breach has occurred and no Event of Default is ongoing, Landlord shall pay the TI Allowance to Tenant within sixty (60) days after the latest to occur of the following: (a) Tenant's written request for payment of the TI Allowance certifying completion of the initial Tenant-Made Alterations in accordance with the terms of this Lease, (b) Landlord's receipt of Tenant's invoice and reasonable supporting documentation substantiating the costs related thereto, (c) Landlord's receipt of final and unconditional lien waivers from all contractors and subcontractors who did work on the initial Tenant-Made Alterations, (d) Landlord's receipt of a copy of the final permit approved by the applicable governing authority to the extent required for such Tenant-Made Alterations, (e) delivery of any as-builts to Landlord in electronic or hard copy format as elected by Landlord, and (f) at Landlord's election, an estoppel certificate, executed by Tenant. Landlord shall be under no obligation to pay for any Tenant-Made Alterations to the Premises in excess of the TI Allowance. Further, such TI Allowance shall only be available for Tenant's use for six (6) months following the Commencement Date and Tenant hereby waives any and all rights to any unused portion of the TI Allowance remaining as of the first day of the seventh (7th) month of the Lease Term. Subject to Tenant complying with the terms and conditions stated herein (including, without limitation, complying with all applicable Legal Requirements and Landlord's review of any detailed plans), Landlord hereby approves in concept only (but subject Landlord's other rights stated herein), Tenant situating the Durararap along the exterior of the western wall of the Building, provided that such Durararap and the use thereof shall not interfere with any ingress, egress or access by any other occupants or tenants of the Project.

(1)    **Liens; Bonds.** Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 20 days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 20 day period.

(2)    **Surrender; Restoration.** Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in broom-clean and good condition and repair (with all Tenant-Made Alterations (including, without limitation, any initial Tenant-Made Alterations), Improvements and Trade Fixtures removed except as otherwise expressly agreed in writing by Landlord) ordinary wear and tear, casualty loss and condemnation covered by Sections 9 and 14 excepted and otherwise in accordance with this Section. Without limiting the foregoing, Tenant shall remove any odor which may exist in the Premises resulting from Tenant's occupancy of the Premises upon the termination of this Lease Term or earlier termination of Tenant's right of possession. Any Trade Fixtures, Tenant-Made Alterations, equipment, furniture, and other property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Rent, Operating Expenses and all obligations concerning the condition and repair of the Premises. Without limiting Tenant's obligations under this Lease, Tenant acknowledges that it shall have the affirmative obligation to remove all racking and floor striping from the Premises by or before the expiration or earlier termination of the Lease Term. As guidance to the parties, removal of the aforementioned racking shall include, without limitation, removal of the bolts in concrete associated therewith, all of which cut flush at the surface and pushed into the concrete one inch or more below the slab. Tenant shall clean all resulting holes and shall fill the same with epoxy flush to the floor's surface. Tenant understands that the holes created for any anchor bolts placed by or on behalf of Tenant must be drilled one inch deeper than the length of the anchor bolts themselves to permit removal in the manner provided above. Furthermore, if Tenant places (or causes to be placed) any floor striping in the Premises, then following removal of any such floor striping (a) there shall be no residual staining or other indication that such striping existed and (b) Tenant must re-seal the floor with a sealant reasonably acceptable to Landlord. If Tenant elects to stripe the floor of the Premises, then Tenant shall utilize a floor striping material which can be removed and which will not permeate into the flooring. The foregoing does not constitute Landlord's consent to Tenant's placement of any racking and/or floor striping in the Premises, which placement shall be governed by the provision of the Lease. Additionally, without limiting Tenant's obligations under the Lease, Tenant acknowledges that it shall have the affirmative obligation to cause all office, warehouse, emergency and exit lights to be fully operational with all bulbs and ballasts functioning, all truck

4013376.8
24396-991

Page 6 of 15

INITIALS

doors, service doors, roll up doors and dock levelers serviced and placed in good operating order (including replacement of any dented truck door panels and adjustment of door tension to insure proper operation, with all door panels that have been replaced painted to match the building standard); dock seals/dock bumpers to be free of tears and broken backboards; all structural steel columns in the warehouse and office to be inspected for damage, with repairs of this nature pre-approved by Landlord prior to implementation; sheetrock (drywall) damage to be patched and fire-taped so that there are no holes in either office or warehouse; walls, carpet and vinyl tiles to be in a clean condition without any holes or chips in them (Landlord will accept normal wear on these items provided they appear to be in a maintained condition); any Tenant-installed equipment to be removed from the roof and roof penetrations properly repaired by licensed roofing contractor approved by Landlord; all exterior signs to be removed and holes patched and paint touched-up as necessary; HVAC systems to be placed in good working order, including the necessary replacement of any parts to return the unit to a well maintained condition; and all electrical and plumbing equipment to be returned in good condition and repair and conforming to code.

8.        **Insurance; Indemnity.**

A.        Landlord's Insurance. Landlord shall maintain all risk or special form property insurance covering the full replacement cost of the Building, or the amount required by any Lender, and commercial general liability insurance on the Project and rent loss insurance for one year with an extended period of indemnity for an additional 180 days, all in forms and amounts customary for properties substantially similar to the Project, subject to customary deductibles. If available and commercially appropriate such property insurance policy or policies shall insure against all risks of direct physical loss or damage, including coverage for debris removal and the enforcement of any Legal Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to earthquake insurance. All such insurance costs shall be included as part of the Operating Expenses charged to Tenant. The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the total insurance cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises. Tenant shall not be named as an additional insured in such policies. Landlord shall not be required to insure Tenant's Improvements, property, Trade Fixtures or Tenant-Made Alterations.

B.        Tenant's Insurance. Tenant, at its expense, shall maintain during the Lease Term the following insurance, at Tenant's sole cost and expense: (1) commercial general liability insurance (and, if necessary, commercial excess liability insurance) applicable to the Premises and its appurtenances providing a minimum combined single limit of not less than $2,000,000 per occurrence with an annual aggregate of not less than $2,000,000; and if Tenant stores property of others for a fee, Tenant shall maintain warehouse operator's legal liability insurance for the full value of the property of such customers as determined by the warehouse contract between Tenant and its customer; (2) all risk or special form property insurance covering the full replacement cost of all property, including Tenant-Made Alterations, Trade Fixtures, and improvements installed in the Premises by Tenant with a deductible not to exceed $1,000 per occurrence (unless otherwise agreed in writing by Landlord); (3) business interruption insurance with a limit of liability representing loss of at least approximately 6 months of income; (4) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute; (5) employers liability insurance of at least $1,000,000; and (6) business automobile liability insurance (and, if necessary, commercial excess liability insurance) having a combined single limit of not less than $2,000,000 per accident insuring Tenant against liability arising out of the ownership maintenance or use of any owned, hired or nonowned automobiles. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. Any company writing any of Tenant's insurance shall have an A.M. Best rating of not less than A-VII and the general liability policy shall be deemed primary and noncontributory coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). All commercial general liability and, if applicable, warehouse operator's legal liability insurance policies shall name Tenant as a named insured and Landlord, its property manager, and other designees of Landlord as the interest of such designees shall appear, as additional insureds. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include (a) a waiver of subrogation endorsement and (b) coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. If the general liability insurance contains a general aggregate limit, it shall apply separately to this Premises. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease. Tenant shall provide Landlord with certificates of such insurance (including copies of all required endorsements) as required under this Lease prior to the earlier to occur of the Commencement Date or the date Tenant is provided with possession of the Premises, and thereafter upon renewals at least 10 days prior to the expiration of the insurance coverage. Acceptance by Landlord of delivery of any certificates of insurance does not constitute approval or agreement by Landlord that the insurance requirements of this section have been met, and failure of Landlord to identify a deficiency from evidence provided will not be construed as a waiver of Tenant's obligation to maintain such insurance. In the event any of the insurance policies required to be carried by Tenant under this Lease shall be cancelled prior to the expiration date of such policy, or if Tenant receives notice of any cancellation of such insurance policies from the insurer prior to the expiration date of such policy, Tenant shall: (a) immediately deliver notice to Landlord that such insurance has been, or is to be, cancelled, (b) shall promptly replace such insurance policy in order to assure no lapse of coverage shall occur, and (c) shall deliver to Landlord a certificate of insurance (including copies of all required endorsements) for such replacement policy. The insurance required to be maintained by Tenant hereunder are only Landlord's minimum insurance requirements and Tenant agrees and understands that such insurance requirements may not be sufficient to fully meet Tenant's insurance needs.

C.        Waiver of Subrogation. Without affecting any other rights or remedies, Tenant and Landlord each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable herein (except as otherwise expressly set forth in this Lease). The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Landlord or Tenant, as the case may be, so long as the insurance is not invalidated thereby.

D.        Indemnity. Except to the extent of Landlord's gross negligence or willful misconduct, Tenant shall indemnify, protect, defend and hold harmless the Premises, Landlord and its agents, Landlord's master or ground Landlord, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant and/or any default hereunder by Tenant. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense. Landlord need not have first paid any such claim in order to be defended or indemnified.

E.        Exemption of Landlord and its Agents from Liability. Notwithstanding the negligence (including, without limitation, gross negligence) or breach of this Lease by Landlord or its agents, neither Landlord nor its agents shall be liable under any circumstances (pursuant to any legal or equitable remedy) for: (a) injury or damage to the person or goods, wares, merchandise or other property of Tenant, Tenant's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (b) any damages arising from any act or neglect of any other tenant of Landlord or from the failure of Landlord or its agents to enforce the provisions of any other lease in the Project, (c) injury to Tenant's business or for any loss of income or profit therefrom, or (d) consequential or punitive damages. Instead, it is intended that Tenant's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Tenant is required to maintain pursuant to the provisions of this Section.

F.        Failure to Provide Insurance. Tenant acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Landlord to risks and potentially cause Landlord to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. If Tenant shall fail to procure and maintain the insurance required to be carried by it, Landlord may, but shall not be required to, procure and maintain the same, and Tenant shall promptly pay to Landlord a sum equal to 115% of the cost thereof.

G.        Insurance for Vendors. All vendors, movers and contractors engaged by or on behalf of Tenant to perform work in or about the Premises shall deliver proof of insurance to Landlord before said person or entity will be permitted to commence work, which insurance must name Landlord as an additional insured thereunder and be otherwise reasonably acceptable to Landlord.

9.        **Damage or Destruction.**

A.        Restoration. If at any time during the Lease Term the Premises are damaged by a fire or other casualty covered by insurance carried by Landlord, Landlord shall notify Tenant within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 12 months from the casualty date or if Landlord is unable to obtain the necessary permits for restoration within 6 months from the casualty date (a "Premises Total Destruction"), either Landlord or Tenant may elect to terminate this

4013376.8
24396-991

INITIALS

doors, service doors, roll up doors and dock levelers serviced and placed in good operating order (including replacement of any dented truck door panels and adjustment of door tension to insure proper operation, with all door panels that have been replaced painted to match the building standard); dock seals/dock bumpers to be free of tears and broken backboards; all structural steel columns in the warehouse and office to be inspected for damage, with repairs of this nature pre-approved by Landlord prior to implementation; sheetrock (drywall) damage to be patched and fire-taped so that there are no holes in either office or warehouse; walls, carpet and vinyl tiles to be in a clean condition without any holes or chips in them (Landlord will accept normal wear on these items provided they appear to be in a maintained condition); any Tenant-installed equipment to be removed from the roof and roof penetrations properly repaired by licensed roofing contractor approved by Landlord; all exterior signs to be removed and holes patched and paint touched-up as necessary; HVAC systems to be placed in good working order, including the necessary replacement of any parts to return the unit to a well maintained condition; and all electrical and plumbing equipment to be returned in good condition and repair and conforming to code.

8.      **Insurance; Indemnity.**

A.      **Landlord's Insurance.** Landlord shall maintain all risk or special form property insurance covering the full replacement cost of the Building, or the amount required by any Lender, and commercial general liability insurance on the Project and rent loss insurance for one year with an extended period of indemnity for an additional 180 days, all in forms and amounts customary for properties substantially similar to the Project, subject to customary deductibles. If available and commercially appropriate such property insurance policy or policies shall insure against all risks of direct physical loss or damage, including coverage for debris removal and the enforcement of any Legal Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to earthquake insurance. All such insurance costs shall be included as part of the Operating Expenses charged to Tenant. The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the total insurance cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises. Tenant shall not be named as an additional insured in such policies. Landlord shall not be required to insure Tenant's improvements, property, Trade Fixtures or Tenant-Made Alterations.

B.      **Tenant's Insurance.** Tenant, at its expense, shall maintain during the Lease Term the following insurance, at Tenant's sole cost and expense: (1) commercial general liability insurance (and, if necessary, commercial excess liability insurance) applicable to the Premises and its appurtenances providing a minimum combined single limit of not less than $2,000,000 per occurrence with an annual aggregate of not less than $2,000,000; and if Tenant stores property of others for a fee, Tenant shall maintain warehouse operator's legal liability insurance for the full value of the property of such customers as determined by the warehouse contract between Tenant and its customer; (2) all risk or special form property insurance covering the full replacement cost of all property, Tenant-Made Alterations, Trade Fixtures, and improvements installed or placed in the Premises by Tenant with a deductible not to exceed $1,000 per occurrence (unless otherwise agreed in writing by Landlord); (3) business interruption insurance with a limit of liability representing loss of at least approximately 6 months of income; (4) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute; (5) employers liability insurance of at least $1,000,000; and (6) business automobile liability insurance (and, if necessary, commercial excess liability insurance) having a combined single limit of not less than $2,000,000 per accident insuring Tenant against liability arising out of the ownership maintenance or use of any owned, hired or nonowned automobiles. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. Any company writing any of Tenant's insurance shall have an A.M. Best rating of not less than A-VII and the general liability policy shall be endorsed to provide primary and noncontributory coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). All commercial general liability and, if applicable, warehouse operator's legal liability insurance policies shall name Tenant as a named insured and Landlord, its property manager, and other designees of Landlord as the interest of such designees shall appear, as additional insureds. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include (a) a waiver of subrogation endorsement and (b) coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. If the general liability insurance contains a general aggregate limit, it shall apply separately to this Premises. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease. Tenant shall provide Landlord with certificates of such insurance (including copies of all required endorsements) as required under this Lease prior to the earlier to occur of the Commencement Date or the date Tenant is provided with possession of the Premises, and thereafter upon renewals at least 10 days prior to the expiration of the insurance coverage. Acceptance by Landlord of delivery of any certificates of insurance does not constitute approval or agreement by Landlord that the insurance requirements of this section have been met, and failure of Landlord to identify a deficiency from evidence provided will not be construed as a waiver of Tenant's obligation to maintain such insurance. In the event any of the insurance policies required to be carried by Tenant under this Lease shall be cancelled prior to the expiration date of such policy, or if Tenant receives notice of any cancellation of such insurance policies from the insurer prior to the expiration date of such policy, Tenant shall: (a) immediately deliver notice to Landlord that such insurance has been, or is to be, cancelled, (b) shall promptly replace such insurance policy in order to assure no lapse of coverage shall occur, and (c) shall deliver to Landlord a certificate of insurance (including copies of all required endorsements) for such replacement policy. The insurance required to be maintained by Tenant hereunder are only Landlord's minimum insurance requirements and Tenant agrees and understands that such insurance requirements may not be sufficient to fully meet Tenant's insurance needs

C.      **Waiver of Subrogation.** Without affecting any other rights or remedies, Tenant and Landlord each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable herein (except as otherwise expressly set forth in this Lease). The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Landlord or Tenant, as the case may be, so long as the insurance is not invalidated thereby.

D.      **Indemnity.** Except to the extent of Landlord's gross negligence or willful misconduct, Tenant shall indemnify, protect, defend and hold harmless the Premises, Landlord and its agents, Landlord's master or ground Landlord, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant and/or any default hereunder by Tenant. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense. Landlord need not have first paid any such claim in order to be defended or indemnified.

E.      **Exemption of Landlord and its Agents from Liability.** Notwithstanding the negligence (including, without limitation, gross negligence) or breach of this Lease by Landlord or its agents, neither Landlord nor its agents shall be liable under any circumstances (pursuant to any legal or equitable remedy) for: (a) injury or damage to the person or goods, wares, merchandise or other property of Tenant, Tenant's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (b) any damages arising from any act or neglect of any other tenant of Landlord or from the failure of Landlord or its agents to enforce the provisions of any other lease in the Project, (c) injury to Tenant's business or for any loss of income or profit therefrom, or (d) consequential or punitive damages. Instead, it is intended that Tenant's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Tenant is required to maintain pursuant to the provisions of this Section

F.      **Failure to Provide Insurance.** Tenant acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Landlord to risks and potentially cause Landlord to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. If Tenant shall fail to procure and maintain the insurance required to be carried by it, Landlord may, but shall not be required to, procure and maintain the same, and Tenant shall promptly pay to Landlord a sum equal to 115% of the cost thereof.

G.      **Insurance for Vendors.** All vendors, movers and contractors engaged by or on behalf of Tenant to perform work in or about the Premises shall deliver proof of insurance to Landlord before said person or entity will be permitted to commence work, which insurance must name Landlord as an additional insured thereunder and be otherwise reasonably acceptable to Landlord.

9.      **Damage or Destruction.**

A.      **Restoration.** If at any time during the Lease Term the Premises are damaged by a fire or other casualty covered by insurance carried by Landlord, Landlord shall notify Tenant within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 12 months from the casualty date or if Landlord is unable to obtain the necessary permits for restoration within 6 months from the casualty date (a **"Premises Total Destruction"**), either Landlord or Tenant may elect to terminate this

4013376.8
24396-991

INITIALS

Lease upon notice to the other party given no later than 30 days after Landlord's notice, provided, however, if the damage or destruction was caused by the negligence or willful misconduct of Tenant, Landlord shall have the right to recover Landlord's damages from Tenant, except as provided in Section 8.C, and Tenant shall have no right to terminate this Lease. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 12 months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall diligently pursue the necessary permits and promptly restore the Premises excluding Trade Fixtures and the Improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events (as defined in Section 47). Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last 6 months of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage. Notwithstanding the foregoing, if Tenant at that time has an exercisable option to extend this Lease, then Tenant may preserve this Lease by exercising such option and providing Landlord with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs within 10 days after Tenant's receipt of Landlord's written notice purporting to terminate this Lease. Base Rent and Operating Expenses shall be abated for the period of repair and restoration of an insured casualty commencing on the date of such casualty event in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss, including without limitation those available under California Civil Code Sections 1932 and 1933(4). Notwithstanding anything contained in the Lease to the contrary, to the extent the damage to the Project is attributable to Tenant, Tenant shall pay to Landlord with respect to any damage to the Project the amount of the commercially reasonable deductible under Landlord's insurance policy, not to exceed $10,000.00, within 30 days after presentment of Landlord's invoice.

B.    **Partial Damage - Uninsured Loss.** If at any time during the Lease Term the Premises are damaged by a casualty that is not covered by insurance carried by Landlord and Landlord estimates that the restoration time is estimated to be 12 months or less from the casualty date ("Premises Partial Damage"), unless caused by a negligent or willful act of Tenant (in which event Tenant shall make the repairs at Tenant's expense), Landlord may either: (a) repair such damage as soon as reasonably possible at Landlord's expense (subject to reimbursement pursuant to the Operating Expenses provisions), in which event this Lease shall continue in full force and effect, or (b) terminate this Lease by giving written notice to Tenant within 30 days after receipt by Landlord of knowledge of the occurrence of such uninsured Premises Partial Damage. Such termination shall be effective 60 days following the date of such notice. In the event Landlord elects to terminate this Lease, Tenant shall have the right within 10 days after receipt of the termination notice to give written notice to Landlord of Tenant's commitment to pay for the repair of such damage without reimbursement from Landlord. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Landlord shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Tenant does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice. Premises Partial Damage due to flood or earthquake shall be subject to this subsection, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Landlord or Tenant.

10.    **Real Property Taxes.**

A.    **Real Property Taxes.** As used herein, the term "Real Property Taxes" shall include any form of assessment: real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Landlord in the Project, Landlord's right to other income therefrom, and/or Landlord's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (a) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (b) a change in the improvements thereon, and/or (c) levied or assessed on machinery or equipment provided by Landlord to Tenant pursuant to this Lease.

B.    **Payment of Taxes.** Except as otherwise provided in Section 10.C, Landlord shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Operating Expenses in accordance with the provisions of Section 4.B.

C.    **Additional Improvements.** Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other tenants or by Landlord for the exclusive enjoyment of such other tenants. Notwithstanding Section 10.B hereof, Tenant shall, however, pay to Landlord at the time Operating Expenses are payable under Section 4.B, the entirety of any increase in Real Property Taxes if assessed solely by reason of Tenant-Made Alterations, Trade Fixtures placed upon the Premises by Tenant or at Tenant's request or by reason of any alterations or improvements to the Premises made by Landlord subsequent to the execution of this Lease by the Parties.

D.    **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Landlord from the respective valuations assigned to the assessor's work sheets or such other information as may be reasonably available. Landlord's reasonable determination thereof shall be conclusive.

E.    **Personal Property Taxes.** Tenant shall pay prior to delinquency all taxes assessed against and levied upon Tenant-Made Alterations, Trade Fixtures, furnishings, equipment and all personal property of Tenant contained in the Premises. When possible, Tenant shall cause its Tenant-Made Alterations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Landlord. If any of Tenant's personal property shall be assessed with Landlord's real property, Tenant shall pay Landlord the taxes attributable to Tenant's property within 10 days after receipt of a written statement setting forth the taxes applicable to Tenant's property.

11.    **Utilities, Services and Trash.** Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, and other utilities and services used on the Premises, all maintenance and metering charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity, utility provider or metering service, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Tenant shall pay for refuse and trash collection services for the Premises if Landlord operates the Project in a manner such that tenants contract directly for trash collection services. Landlord may cause at Tenant's expense any utilities to be separately metered or charged directly to Tenant by the provider in the event Landlord reasonably determines that Tenant's use of such jointly metered utility materially exceeds the use of such jointly metered utility by other tenants in the Building. Tenant shall pay its share of all charges for jointly metered utilities based upon consumption, as reasonably determined by Landlord. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent. Tenant agrees to limit use of water and sewer for normal restroom use. Tenant shall not use the trash bins of the Project other than for disposal of ordinary refuse. In no event shall Tenant use the bins for the disposal of large items, such as (but not limited to) carpet, packing crates, furniture, cardboard shipping boxes and storage pallets.

12.    **Assignment and Subletting.** Without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. It shall be reasonable for the Landlord to withhold, delay or condition its consent, where required, to any assignment or sublease in any of the following instances: (a) the assignee or sublessee does not have a net worth calculated according to generally accepted accounting principles at least equal to the greater of the net worth of Tenant immediately prior to such assignment or sublease or the net worth of the Tenant at the time it executed the Lease; (b) occupancy of the Premises by the assignee or sublessee would, in Landlord's opinion, violate any agreement binding upon Landlord or the Project with regard to the identity of tenants, usage in the Project, or similar matters; (c) the identity or business reputation of the assignee or sublessee will, in the good faith judgment of Landlord, tend to damage the goodwill or reputation of the Project; (d) the assignment or sublease is to another tenant in the Project (or an affiliate thereof) and is at rates which are below those charged by Landlord for comparable space in the Project, or is to a prospective tenant that has been in discussions with Landlord regarding space within the Project; or (e) in the case of a sublease, the subtenant has not acknowledged that the Lease controls over any inconsistent provision in the sublease. The foregoing criteria shall not exclude any other reasonable basis for Landlord to refuse its consent to such assignment or sublease. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Tenant shall provide to Landlord all information concerning the assignee or sublessee as Landlord may reasonably request. Landlord may revoke its consent immediately and without notice if, as of the effective date of the assignment or sublease, there has occurred and is continuing any default under the Lease. For purposes of this Section, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "Tenant Affiliate"), without the prior written consent of Landlord. Tenant shall reimburse Landlord for all of Landlord's reasonable expenses in connection with any assignment or sublease not to exceed $3,000.00. This Lease shall be binding upon Tenant and its successors and permitted assigns. Upon Landlord's receipt of Tenant's written notice of a

4013376.8
24396-991



INITIALS

Lease upon notice to the other party given no later than 30 days after Landlord's notice; provided, however, if the damage or destruction was caused by the negligence or willful misconduct of Tenant, Landlord shall have the right to recover Landlord's damages from Tenant, except as provided in Section 8.C, and Tenant shall have no right to terminate this Lease. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 12 months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall diligently pursue the necessary permits and promptly restore the Premises excluding Trade Fixtures and the Improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events (as defined in Section 47). Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last 6 months of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage. Notwithstanding the foregoing, if Tenant at that time has an exercisable option to extend this Lease, then Tenant may preserve this Lease by exercising such option and providing Landlord with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs within 10 days after Tenant's receipt of Landlord's written notice purporting to terminate this Lease. Base Rent and Operating Expenses shall be abated for the period of repair and restoration of an insured casualty commencing on the date of such casualty event in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss, including without limitation those available under California Civil Code Sections 1932 and 1933(4). Notwithstanding anything contained in the Lease to the contrary, to the extent the damage to the Project is attributable to Tenant, Tenant shall pay to Landlord with respect to any damage to the Project the amount of the commercially reasonable deductible under Landlord's insurance policy, not to exceed $10,000.00, within 30 days after presentment of Landlord's invoice.

B.      **Partial Damage - Uninsured Loss.** If at any time during the Lease Term the Premises are damaged by a casualty that is not covered by insurance carried by Landlord and Landlord estimates that the restoration time is estimated to be 12 months or less from the casualty date ("Premises Partial Damage"), unless caused by a negligent or willful act of Tenant (in which event Tenant shall make the repairs at Tenant's expense), Landlord may either: (a) repair such damage as soon as reasonably possible at Landlord's expense (subject to reimbursement pursuant to the Operating Expenses provisions), in which event this Lease shall continue in full force and effect, or (b) terminate this Lease by giving written notice to Tenant within 30 days after receipt by Landlord of knowledge of the occurrence of such uninsured Premises Partial Damage. Such termination shall be effective 60 days following the date of such notice. In the event Landlord elects to terminate this Lease, Tenant shall have the right within 10 days after receipt of the termination notice to give written notice to Landlord of Tenant's commitment to pay for the repair of such damage without reimbursement from Landlord. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Landlord shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Tenant does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice. Premises Partial Damage due to flood or earthquake shall be subject to this subsection, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Landlord or Tenant.

10.     **Real Property Taxes.**

A.      **Real Property Taxes.** As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Landlord in the Project, Landlord's right to other income therefrom, and/or Landlord's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. The term "**Real Property Taxes**" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (a) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (b) a change in the Improvements thereon, and/or (c) levied or assessed on machinery or equipment provided by Landlord to Tenant pursuant to this Lease.

B.      **Payment of Taxes.** Except as otherwise provided in Section 10.C, Landlord shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Operating Expenses in accordance with the provisions of Section 4.B.

C.      **Additional Improvements.** Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other tenants or by Landlord for the exclusive enjoyment of such other tenants. Notwithstanding Section 10.B hereof, Tenant shall, however, pay to Landlord at the time Operating Expenses are payable under Section 4.B, the entirety of any increase in Real Property Taxes if assessed solely by reason of Tenant-Made Alterations, Trade Fixtures placed upon the Premises by Tenant or at Tenant's request or by reason of any alterations or improvements to the Premises made by Landlord subsequent to the execution of this Lease by the Parties.

D.      **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Landlord from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Landlord's reasonable determination thereof shall be conclusive.

E.      **Personal Property Taxes.** Tenant shall pay prior to delinquency all taxes assessed against and levied upon Tenant-Made Alterations, Trade Fixtures, furnishings, equipment and all personal property of Tenant contained in the Premises. When possible, Tenant shall cause its Tenant-Made Alterations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Landlord. If any of Tenant's said property shall be assessed with Landlord's real property, Tenant shall pay Landlord the taxes attributable to Tenant's property within 10 days after receipt of a written statement setting forth the taxes applicable to Tenant's property.

11.     **Utilities, Services and Trash.** Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, and other utilities and services used on the Premises, all maintenance and metering charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity, utility provider or metering service, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Tenant shall pay for refuse and trash collection services for the Premises if Landlord operates the Project in a manner such that tenants contract directly for trash collection services. Landlord may cause at Tenant's expense any utilities to be separately metered or charged directly to Tenant by the provider in the event Landlord reasonably determines that Tenant's use of such jointly metered utility materially exceeds the use of such jointly metered utility by other tenants in the Building. Tenant shall pay its share of all charges for jointly metered utilities based upon consumption, as reasonably determined by Landlord. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent. Tenant agrees to limit use of water and sewer for normal restroom use. Tenant shall not use the trash bins of the Project other than for disposal of ordinary refuse. In no event shall Tenant use the bins for the disposal of large items, such as (but not limited to) carpet, packing crates, furniture, cardboard shipping boxes and storage pallets.

12.     **Assignment and Subletting.** Without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. It shall be reasonable for the Landlord to withhold, delay or condition its consent, where required, to any assignment or sublease in any of the following instances: (a) the assignee or sublessee does not have a net worth calculated according to generally accepted accounting principles at least equal to the greater of the net worth of Tenant immediately prior to such assignment or sublease or the net worth of the Tenant at the time it executed the Lease; (b) occupancy of the Premises by the assignee or sublessee would, in Landlord's opinion, violate any agreement binding upon Landlord or the Project with regard to the identity of tenants, usage in the Project, or similar matters; (c) the identity or business reputation of the assignee or sublessee will, in the good faith judgment of Landlord, tend to damage the goodwill or reputation of the Project; (d) the assignment or sublease is to another tenant in the Project (or an affiliate thereof) and is at rates which are below those charged by Landlord for comparable space in the Project, or is to a prospective tenant that has been in discussions with Landlord regarding space within the Project; or (e) in the case of a sublease, the subtenant has not acknowledged that the Lease controls over any inconsistent provision in the sublease. The foregoing criteria shall not exclude any other reasonable basis for Landlord to refuse its consent to such assignment or sublease. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Tenant shall provide to Landlord all information concerning the assignee or sublessee as Landlord may reasonably request. Landlord may revoke its consent immediately and without notice if, as of the effective date of the assignment or sublease, there has occurred and is continuing any default under the Lease. For purposes of this Section, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "**Tenant Affiliate**"), without the prior written consent of Landlord. Tenant shall reimburse Landlord for all of Landlord's reasonable expenses in connection with any assignment or sublease not to exceed $3,000.00. This Lease shall be binding upon Tenant and its successors and permitted assigns. Upon Landlord's receipt of Tenant's written notice of a

desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease. Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). If Landlord consents to any assignment or subletting of Tenant's interest in this Lease, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of all rent, additional rent or other consideration (including, without limitation, key money or other cash consideration if applicable) payable by such assignee or sublessee in connection with an assignment or subletting in excess of the Base Rent and Operating Expenses payable by Tenant under this Lease during the term of the applicable assignment or subletting on a per rentable area square foot basis if less than all of the Premises is transferred (unless all or a portion of the subject space is subject to different Base Rent and Operating Expenses terms, in which case, to the extent applicable, such different terms shall be applicable), after deducting the reasonable brokerage and improvement costs (including improvement allowances) payable to third parties as necessary to conclude the applicable assignment or subletting. If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent otherwise set forth herein, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder. Tenant hereby waives and releases its rights under Section 1995.310 of the California Civil Code or under any similar law, statute or ordinance now or hereafter in effect.

If Tenant shall be subjected to the provisions of the United States Bankruptcy Code or other law of the United States or any state thereof for the protection of debtors as in effect at such time (each a "Debtor's Law") Tenant, Tenant as debtor-in-possession, and any trustee or receiver of Tenant's assets (each a "Tenant's Representative") shall have no greater right to assume or assign this Lease or any interest in this Lease, or to sublease any of the Premises than accorded to Tenant this Section of the Lease, except to the extent Landlord shall be required to permit such assumption, assignment or sublease by the provisions of such Debtor's Law. In such case, Tenant's Representative shall (a) remain subject to all of the terms and requirements of this Section; (b) shall have deposited with Landlord as security for the timely payment of rent an amount equal to the larger of: (1) three (3) months' Rent and other monetary charges accruing under this Lease; and (2) any sum specified in Section 1 (Basic Lease Provisions) of this Lease; and (c) shall have provided Landlord with adequate other assurance of the future performance of the obligations of Tenant under this Lease. In the event that an attorney is employed or expenses are incurred to pursue, protect, enforce or litigate the obligations hereunder, whether by suit, action or other proceeding, Tenant's Representative promises to pay all such expenses and reasonable attorneys' fees, including, without limitation, reasonable attorneys' fees incurred in or with respect to any bankruptcy proceeding.

13.    **Events of Default; Remedies.**

    A.    Event of Default: Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

        (1)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

        (2)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (a) make a general assignment for the benefit of creditors; (b) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (c) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (d) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

        (3)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

        (4)    Tenant shall cease to occupy or shall vacate the Premises whether or not Tenant is in monetary or other default under this Lease. Tenant's vacating of the Premises shall not constitute an Event of Default if, prior to vacating the Premises, Tenant has made arrangements reasonably acceptable to Landlord to:

            (a)  ensure that Tenant's insurance for the Premises will not be voided or cancelled with respect to the Premises as a result of such vacancy,

            (b)  ensure that the Premises are secured and not subject to vandalism, and

            (c)  ensure that the Premises will be properly maintained after such vacation, including, but not limited to, keeping the heating, ventilation and cooling systems maintenance contracts required by this Lease in full force and effect and maintaining the utility services. Tenant shall inspect the Premises at least once each month and report monthly in writing to Landlord on the condition of the Premises.

        (5)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

        (6)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 20 days after any such lien or encumbrance is filed against the Premises.

        (7)    Tenant shall fail to provide to Landlord (a) reasonable written evidence of compliance with Legal Requirements, (b) the service contracts required under this Lease, (c) an estoppel certificate or financial statements as required hereunder, (d) a requested subordination, (e) evidence concerning any guaranty and/or Guarantor, (f) any document requested under Section 38 (Reservations), (g) material data safety sheets (MSDS), or (h) any other documentation or information which Landlord may reasonably require of Tenant under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Tenant.

        (8)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 13.A, and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default (said notice being in lieu of, and not in addition to, any notice required as a prerequisite to a forcible entry and detainer or similar action for possession of the Premises). Tenant agrees that any notice given by Landlord pursuant to this Section of the Lease shall satisfy the requirements for notice under California Code of Civil Procedure Section 1161, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

        (9)    Tenant shall be delinquent by more than 15 days in the payment of Rent on 3 separate occasions in any 12 month period, or Tenant or Tenant's employees, agents or representatives fail to comply with any of the rules and regulations for the Project more than 2 times in any 12 month period.

        (10)    Any default or breach by Seller or Tenant under the Purchase Agreement.

Tenant agrees that any notice given by Landlord pursuant to this Section of the Lease shall satisfy the requirements for notice under California Code of Civil Procedure Section 1161, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

    B.    Remedies.  Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided), and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises. Except as otherwise provided in the next paragraph, if Tenant breaches this Lease and abandoned the Premises prior to the end of the term hereof, or if Tenant's right to possession is

INITIALS

desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease. Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). If Landlord consents to any assignment or subletting of Tenant's interest in this Lease, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of all rent, additional rent or other consideration (including, without limitation, key money or other cash consideration if applicable) payable by such assignee or sublessee in connection with an assignment or subletting in excess of the Base Rent and Operating Expenses payable by Tenant under this Lease during the term of the applicable assignment or subletting on a per rentable area square foot basis if less than all of the Premises is transferred (unless all or a portion of the subject space is subject to different Base Rent and Operating Expenses terms, in which case, to the extent applicable, such different terms shall be applicable), after deducting the reasonable brokerage and improvement costs (including improvement allowances) payable to third parties as necessary to conclude the applicable assignment or subletting. If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant thereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent otherwise set forth herein, apply the amount collected to the next rent payable hereunder, and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder. Tenant hereby waives and releases its rights under Section 1995.310 of the California Civil Code or under any similar law, statute or ordinance now or hereafter in effect.

If Tenant shall be subjected to the provisions of the United States Bankruptcy Code or other law of the United States or any state thereof for the protection of debtors as in effect at such time (each a "Debtor's Law") Tenant, Tenant as debtor-in-possession, and any trustee or receiver of Tenant's assets (each a "Tenant's Representative") shall have no greater right to assume or assign this Lease or any interest in this Lease, or to sublease any of the Premises than accorded to Tenant this Section of the Lease, except to the extent Landlord shall be required to permit such assumption, assignment or sublease by the provisions of such Debtor's Law. In such case, Tenant's Representative shall (a) remain subject to all of the terms and requirements of this Section; (b) shall have deposited with Landlord as security for the timely payment of rent an amount equal to the larger of: (1) three (3) months' Rent and other monetary charges accruing under this Lease; and (2) any sum specified in Section 1 (Basic Lease Provisions) of this Lease; and (c) shall have provided Landlord with adequate other assurance of the future performance of the obligations of Tenant under this Lease. In the event that an attorney is employed or expenses are incurred to pursue, protect, enforce or litigate the obligations hereunder, whether by suit, action or other proceeding, Tenant's Representative promises to pay all such expenses and reasonable attorneys' fees, including, without limitation, reasonable attorneys' fees incurred in or with respect to any bankruptcy proceeding.

13.     **Events of Default; Remedies.**

A.     **Event of Default:** Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(1)     Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(2)     Tenant or any guarantor or surety of Tenant's obligations hereunder shall (a) make a general assignment for the benefit of creditors; (b) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (c) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (d) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(3)     Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(4)     Tenant shall cease to occupy or shall vacate the Premises whether or not Tenant is in monetary or other default under this Lease. Tenant's vacating of the Premises shall not constitute an Event of Default if, prior to vacating the Premises, Tenant has made arrangements reasonably acceptable to Landlord to:

(a)     ensure that Tenant's insurance for the Premises will not be voided or cancelled with respect to the Premises as a result of such vacancy,

(b)     ensure that the Premises are secured and not subject to vandalism, and

(c)     ensure that the Premises will be properly maintained after such vacation, including, but not limited to, keeping the heating, ventilation and cooling systems maintenance contracts required by this Lease in full force and effect and maintaining the utility services. Tenant shall inspect the Premises at least once each month and report monthly in writing to Landlord on the condition of the Premises.

(5)     Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(6)     Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 20 days after any such lien or encumbrance is filed against the Premises.

(7)     Tenant shall fail to provide to Landlord (a) reasonable written evidence of compliance with Legal Requirements, (b) the service contracts required under this Lease, (c) an estoppel certificate or financial statements as required hereunder, (d) a requested subordination, (e) evidence concerning any guaranty and/or Guarantor, (f) any document requested under Section 38 (Reservations), (g) material data safety sheets (MSDS), or (h) any other documentation or information which Landlord may reasonably require of Tenant under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Tenant.

(8)     Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 13.A, and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default (said notice being in lieu of, and not in addition to, any notice required as a prerequisite to a forcible entry and detainer or similar action for possession of the Premises). Tenant agrees that any notice given by Landlord pursuant to this Section of the Lease shall satisfy the requirements for notice under California Code of Civil Procedure Section 1161, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

(9)     Tenant shall be delinquent by more than 15 days in the payment of Rent on 3 separate occasions in any 12 month period, or Tenant or Tenant's employees, agents or representatives fail to comply with any of the rules and regulations for the Project more than 2 times in any 12 month period.

(10)     Any default or breach by Seller or Tenant under the Purchase Agreement.

Tenant agrees that any notice given by Landlord pursuant to this Section of the Lease shall satisfy the requirements for notice under California Code of Civil Procedure Section 1161, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

B.     **Remedies.** Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided), and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises. Except as otherwise provided in the next paragraph, if Tenant breaches this Lease and abandoned the Premises prior to the end of the term hereof, or if Tenant's right to possession is

4013376.8
24396-991



INITIALS

terminated by Landlord because of an Event of Default by Tenant under this Lease, this Lease shall terminate.  Upon such termination, Landlord may recover from Tenant the following, as provided in Section 1951.2 of the Civil Code of California: (a) the worth at the time of award of the unpaid Base Rent and other charges under this Lease that had been earned at the time of termination; (b) the worth at the time of award of the amount by which the reasonable value of the unpaid Base Rent and other charges under this Lease which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (c) the worth at the time of award by which the reasonable value of the unpaid Base Rent and other charges under this Lease for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; and (d) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or that in the ordinary course of things would be likely to result therefrom.  As used herein, the following terms are defined:

(1)    The "worth at the time of award" of the amounts referred to in clauses (a) and (b) above is computed by allowing interest at the lesser of 18 percent per annum or the maximum lawful rate.  The "worth at the time of award" of the amount referred to in clause (iii) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent;

(2)    The "time of award" as used in clauses (a), (b), and (c) above is the date on which judgment is entered by a court of competent jurisdiction;

(3)    The "reasonable value" of the amount referred to in clause (b) above is computed by determining the mathematical product of (i) the "reasonable annual rental value" (as defined herein) and (ii) the number of years, including fractional parts thereof, between the date of termination and the time of award.  The "reasonable value" of the amount referred to in clause (c) above is computed by determining the mathematical product of (1) the annual Base Rent and other charges under this Lease and (2) the number of years including fractional parts thereof remaining in the balance of the term of this Lease after the time of award.  Tenant acknowledges and agrees that the term "detriment proximately caused by Tenant's failure to perform its obligations under this Lease" includes, without limitation, the value of any abated or free rent given to Tenant.  Even though Tenant has breached this Lease and abandoned the Premises, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover rent as it becomes due.  This remedy is intended to be the remedy described in California Civil Code Section 1951.4, and the following provision from such Civil Code Section is hereby repeated: "The Lessor has the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign subject only to reasonable limitations)."  Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.  Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant.  Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same.  Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default.  A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord.  To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge.  The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings.  Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises).  Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

C.    Interest.  Any amount not paid by Tenant within 5 days after its due date in accordance with the terms of this Lease, regardless of whether an Event of Default exists, shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or fifteen percent (15%) per year.  It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease.  If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

D.    Breach by Landlord.  Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary).  All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease or offset any Rent due under this Lease for breach of Landlord's obligations hereunder.

14.    Condemnation.  If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would materially interfere with or impair Landlord's ownership or operation of the Project, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date.  If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances.  In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award.  Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

15.    Brokerage Fees.  Tenant and Landlord each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Broker set forth in the Basic Lease Provisions) in connection with this Lease, and that no one is entitled to any commission or finder's fee in connection with this leasing transaction as Broker is entitled to a commission by Tenant or Seller only in connection with the Purchase Agreement.  Tenant and Landlord do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.  Landlord hereby notifies Tenant that one (1) or more of Landlord's principals is a licensed California real estate broker.

16.    Estoppel Certificates; Financial Statements.

A.    Tenant agrees, from time to time, within 10 days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord.  Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease.  No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate.

B.    If Landlord desires to finance, refinance, or sell the Premises, or any part thereof, or if there is an Event of Default, or if Tenant requests permission to assign the Lease, or if Tenant exercises any renewal/extension option hereunder, Tenant and all Guarantors shall within 10 days after written notice from Landlord deliver to Landlord, any potential lender or purchaser designated by Landlord if applicable, such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Tenant's financial statements for the past 3 years.  All such financial statements shall be received by Landlord and any such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

4013376.8
24396-991



INITIALS

terminated by Landlord because of an Event of Default by Tenant under this Lease, this Lease shall terminate. Upon such termination, Landlord may recover from Tenant the following, as provided in Section 1951.2 of the Civil Code of California: (a) the worth at the time of award of the unpaid Base Rent and other charges under this Lease that had been earned at the time of termination; (b) the worth at the time of award of the amount by which the reasonable value of the unpaid Base Rent and other charges under this Lease which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (c) the worth at the time of award by which the reasonable value of the unpaid Base Rent and other charges under this Lease for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided, and (d) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or that in the ordinary course of things would be likely to result therefrom. As used herein, the following terms are defined:

(1)    The "worth at the time of award" of the amounts referred to in clauses (a) and (b) above is computed by allowing interest at the lesser of 18 percent per annum or the maximum lawful rate. The "worth at the time of award" of the amount referred to in clause (iii) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent;

(2)    The "time of award" as used in clauses (a), (b), and (c) above is the date on which judgment is entered by a court of competent jurisdiction;

(3)    The "reasonable value" of the amount referred to in clause (b) above is computed by determining the mathematical product of (i) the "reasonable annual rental value" (as defined herein) and (ii) the number of years, including fractional parts thereof, between the date of termination and the time of award. The "reasonable value" of the amount referred to in clause (c) above is computed by determining the mathematical product of (1) the annual Base Rent and other charges under this Lease and (2) the number of years including fractional parts thereof remaining in the balance of the term of this Lease after the time of award. Tenant acknowledges and agrees that the term "detriment proximately caused by Tenant's failure to perform its obligations under this Lease" includes, without limitation, the value of any abated or free rent given to Tenant. Even though Tenant has breached this Lease and abandoned the Premises, this Lease shall continue in effect for so long as Landlord does not forthwith Tenant's right to possession, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover rent as it becomes due. This remedy is intended to be the remedy described in California Civil Code Section 1951.4, and the following provision from such Civil Code Section is hereby repeated: "The Lessor has the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign subject only to reasonable limitations)." Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may like suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach. Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting this Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

C.    Interest. Any amount not paid by Tenant within 5 days after its due date in accordance with the terms of this Lease, regardless of whether an Event of Default exists, shall bear interest from such due date until paid in full at the lesser of the highest rate provided by applicable law or fifteen percent (15%) per year. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

D.    Breach by Landlord. Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary). All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease or offset any Rent due under this Lease for breach of Landlord's obligations hereunder.

14.    Condemnation. If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would materially interfere with or impair Landlord's ownership or operation of the Project, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same would not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

15.    Brokerage Fees. Tenant and Landlord each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Broker set forth in the Basic Lease Provisions) in connection with this Lease, and that no one is entitled to any commission or finder's fee in connection with this leasing transaction as Broker is entitled to a commission by Tenant or Seller only in connection with the Purchase Agreement. Tenant and Landlord do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto. Landlord hereby notifies Tenant that one (1) or more of Landlord's principals is a licensed California real estate broker.

16.    Estoppel Certificates; Financial Statements.

A.    Tenant agrees, from time to time, within 10 days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate.

B.    If Landlord desires to finance, refinance, or sell the Premises, or any part thereof, or if there is an Event of Default, or if Tenant requests permission to assign the Lease, or if Tenant exercises any renewal/extension option hereunder, Tenant and all Guarantors shall within 10 days after written notice from Landlord deliver to Landlord, any potential lender or purchaser designated by Landlord if applicable, such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Tenant's financial statements for the past 3 years. All such financial statements shall be received by Landlord and any such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

4013376.8
24396-991

INITIALS

17.    Definition of Landlord. The term "Landlord" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the tenant's interest in the prior lease. In the event of a transfer of Landlord's title or interest in the Premises or this Lease, Landlord shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Landlord. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Landlord shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Landlord. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Landlord shall be binding only upon the Landlord as hereinabove defined.

18.    Severability. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

19.    Days. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    Limitation on Liability. Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease or any obligation or liability which may be incurred by it pursuant to any other instrument, transaction, or undertaking contemplated hereby shall not be personally binding upon, nor shall the enforcement thereof be against the property of, its trustees, directors, shareholders, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. For purposes of determining the value of Landlord's interest in the Premises, the Project shall be deemed to be encumbered by a loan in an amount equal to the greater of the actual encumbrance amount or seventy percent (70%) of the fair market value of the Project, as determined as of the date Tenant's claim arises.

21.    Time of Essence. Time is of the essence with respect to the performance of Tenant's and Landlord's obligations under this Lease.

22.    Entire Agreement. This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

23.    Notice. All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by certified or registered mail or U.S. Postal Service Express Mail or other nationally or regionally recognized overnight courier, with postage prepaid, and shall be deemed sufficiently given if served in a manner specified in this Section. The addresses noted adjacent to a party's signature on this Lease shall be that party's address for delivery or mailing of notices. Either party may by written notice to the other specify a different address for notice, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for notice. A copy of all notices to Landlord shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereafter designate in writing. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    Waivers. No waiver by Landlord of the breach of any term, covenant or condition hereof by Tenant or Event of Default, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Event of Default or Tenant breach of any other term, covenant or condition hereof. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to, or approval of, any subsequent or similar act by Tenant, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Landlord shall not be a waiver of any Event of Default by Tenant. Any payment by Tenant may be accepted by Landlord on account of monies or damages due Landlord, notwithstanding any qualifying statements or conditions made by Tenant in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Landlord at or before the time of deposit of such payment. THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.    No Right To Holdover. If Tenant retains possession of the Premises after the termination of this Lease Term or otherwise fails to properly surrender the Premises in the condition required herein, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to one hundred fifty percent (150%) of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Section shall not be construed as consent for Tenant to retain possession of the Premises. For purposes of this Section, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

26.    Cumulative Remedies. No remedy or election by Landlord hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

27.    Covenants and Conditions; Construction of Agreement. All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

28.    Binding Effect; Choice of Law. This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State of California. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

29.    Subordination; Attornment.

    A.    Subordination. This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any deed of trust or mortgage ("Lender"), now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the Lender, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such Lender. Notwithstanding the foregoing, any such Lender may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such Lender shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such Lender and had been assigned to such Lender. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "Lender" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

    B.    Attornment. In the event that Landlord transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a mortgage to which this Lease is subordinated (i) Tenant shall, subject to the non-disturbance provisions hereof, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease shall automatically become a new lease between Tenant and such new owner, and (ii) Landlord shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Landlord's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior Landlord or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Tenant might have against any prior landlord, (c) be bound by prepayment of more than one month's rent, (d) be liable for the return of any security deposit paid to any prior Landlord which was not paid or credited to such new owner, or (e) be bound by any amendment or modification of this Lease not executed by such new owner, if such new owner previously had a lien secured by the Premises.

4013376.8
24396-991

INITIALS

17.    **Definition of Landlord.** The term "Landlord" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the tenant's interest in the prior lease. In the event of a transfer of Landlord's title or interest in the Premises or this Lease, Landlord shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Landlord. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Landlord shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Landlord. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Landlord shall be binding only upon the Landlord as hereinabove defined.

18.    **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

19.    **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability.** Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease or any obligation or liability which may be incurred by it pursuant to any other instrument, transaction, or undertaking contemplated hereby shall not be personally binding upon, nor shall its enforcement thereof be against the property of, its trustees, directors, shareholders, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. For purposes of determining the value of Landlord's interest in the Premises, the Project shall be deemed to be encumbered by a loan in an amount equal to the greater of the actual encumbrance amount or seventy percent (70%) of the fair market value of the Project, as determined as of the date Tenant's claim arises.

21.    **Time of Essence.** Time is of the essence with respect to the performance of Tenant's and Landlord's obligations under this Lease.

22.    **Entire Agreement.** This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

23.    **Notice.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by certified or registered mail or U.S. Postal Service Express Mail or other nationally or regionally recognized overnight courier, with postage prepaid, and shall be deemed sufficiently given if served in a manner specified in this Section. The addresses noted adjacent to a party's signature on this Lease shall be that party's address for delivery or mailing of notices. Either party may by written notice to the other specify a different address for notice, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for notice. A copy of all notices to Landlord shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereafter designate in writing. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers.** No waiver by Landlord of the breach of any term, covenant or condition hereof by Tenant or Event of Default, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Event of Default or Tenant breach of any other term, covenant or condition hereof. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to, or approval of, any subsequent or similar act by Tenant, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Landlord shall not be a waiver of any Event of Default by Tenant. Any payment by Tenant may be accepted by Landlord on account of monies or damages due Landlord, notwithstanding any qualifying statements or conditions made by Tenant in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Landlord at or before the time of deposit of such payment. THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.    **No Right To Holdover.** If Tenant retains possession of the Premises after the termination of the Lease Term or otherwise fails to properly surrender the Premises in the condition required herein, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to one hundred fifty percent (150%) of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Section shall not be construed as consent for Tenant to retain possession of the Premises. For purposes of this Section, "**possession of the Premises**" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has completed and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

26.    **Cumulative Remedies.** No remedy or election by Landlord hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

27.    **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

28.    **Binding Effect; Choice of Law.** This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State of California. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

29.    **Subordination; Attornment**

    A.    **Subordination.** This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any deed of trust or mortgage ("Lender"), now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the Lender, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such Lender. Notwithstanding the foregoing, any such Lender may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such Lender shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such Lender and had been assigned to such Lender. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "Lender" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

    B.    **Attornment.** In the event that Landlord transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a mortgage to which this Lease is subordinated (i) Tenant shall, subject to the non-disturbance provisions hereof, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease shall automatically become a new lease between Tenant and such new owner, and (ii) Landlord shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Landlord's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior Landlord or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Tenant might have against any prior landlord, (c) be bound by prepayment of more than one month's rent, (d) be liable for the return of any security deposit paid to any prior Landlord which was not paid or credited to such new owner, or (e) be bound by any amendment or modification to this Lease not executed by such new owner, if such new owner previously had a lien secured by the Premises.

4013376-8
24396-991



INITIALS

C.    **Self-Executing.** The agreements contained in this Section shall be effective without the execution of any further documents; provided, however, that, upon written request from Landlord or a Lender in connection with a sale, financing or refinancing of the Premises, Tenant and Landlord shall execute such further writings as may be reasonably required, in a form required by Lender, to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

30.    **Attorneys' Fees.** In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the Prevailing Party for its reasonable attorney's fees, filing fees, and court costs. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Landlord shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Event of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Event of Default or resulting breach ($200 is a reasonable minimum per occurrence for such services and consultation).

31.    **Landlord's Access; Showing Premises; Repairs; Solar.** Landlord and Landlord's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Landlord may deem necessary or desirable and the erecting, using and maintaining of, among other things desired by Landlord, utilities, services, security systems, communication systems, fire sprinklers or detection systems, solar power systems, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Tenant's use of the Premises. All such activities shall be without abatement of Rent or liability to Tenant. Without limiting the generality of the foregoing, Tenant agrees and understands that Landlord shall have the right (provided that the exercise of Landlord's rights does not adversely affect Tenant's use and occupancy of the Premises or subject Tenant to additional costs), without Tenant's consent, to place a solar electric generating system, a satellite system and/or other system and/or equipment on the roof of the Building (together with appurtenances within the Premises as reasonably required) or enter into a lease(s) for the roof of the Building whereby such roof tenant(s) shall have the right to install any such systems on the roof of the Building, and Landlord and its agents shall have access to the Premises and roof to accomplish the foregoing.

32.    **Signs; Press Releases.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Any signage shall be at Tenant's sole cost and expense. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may place on the Premises ordinary "For Sale" signs at any time and/or ordinary "For Lease" signs during the last 6 months of the term hereof. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Tenant shall not place any sign upon the Project without Landlord's prior written consent. All signs must comply with all Legal Requirements. Landlord shall have the right to publicize Landlord and Tenant's relationship regarding this Lease.

33.    **Termination; Merger.** Unless specifically stated otherwise in writing by Landlord, the voluntary or other surrender of this Lease by Tenant, the mutual termination or cancellation hereof, or a termination hereof by Landlord for breach by Tenant, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Landlord may elect to continue any one or all existing subtenancies. Landlord's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Landlord's election to have such event constitute the termination of such interest.

34.    **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a party is required to an act by or for the other party, such consent shall not be unreasonably withheld or delayed. Landlord's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Tenant for any Landlord consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Material or a so-called "landlord-lender" agreement, shall be paid by Tenant upon receipt of an invoice and supporting documentation therefor. The failure to specify herein any particular condition to Landlord's consent shall not preclude the imposition by Landlord at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.

35.    **Guarantor.**

A.    **Execution.** The Guarantors, if any, shall each execute Landlord's standard guaranty form.

B.    **Event of Default.** It shall constitute an Event of Default of the Tenant if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

36.    **Quiet Possession.** If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

37.    **Security Measures.** Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of third parties. Tenant acknowledges and agrees that, if Landlord patrols the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

38.    **Reservations.** Landlord reserves the right: (a) to grant, without the consent or joinder of Tenant, such easements, rights and dedications that Landlord deems necessary, (b) to cause the recordation of parcel maps and restrictions, and (c) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Tenant. Tenant agrees to sign any documents reasonably requested by Landlord to effectuate such rights.

39.    **Authority; Multiple Parties; Execution.**

A.    If either Party herein is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

B.    If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant. Additionally, if there be more than one Tenant, then each Tenant hereunder agrees that (a) the act of any one Tenant, acting alone, shall be sufficient to bind all Tenants with respect to their respective rights and obligations under this Lease, and (b) Landlord shall have the unconditional right to rely upon the act of any one Tenant as being binding upon all Tenant's without any obligation to inquire as to the authority of the Tenant with whom Landlord is dealing.

C.    This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Lease. Execution copies of this Lease may be delivered by facsimile or email, and the parties hereto agree to accept and be bound by facsimile signatures or scanned signatures transmitted via email hereto, which signatures shall be considered as original signatures with the transmitted Lease having the same binding effect as an original signature on an original Lease. At the request of either party, any facsimile document or scanned document transmitted via email is to be re-executed in original form by the party who executed the original facsimile document or scanned document. Neither party may raise the use of a facsimile machine or scanned document or the fact that any signature was transmitted through the use of a facsimile machine or email as a defense to the enforcement of this Lease.

4013376.8
24396-991

INITIALS

C.    **Self-Executing.** The agreements contained in this Section shall be effective without the execution of any further documents; provided, however, that, upon written request from Landlord or a Lender in connection with a sale, financing or refinancing of the Premises, Tenant and Landlord shall execute such further writings as may be reasonably required, in a form requested by Lender, to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

30.    **Attorneys' Fees.** In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the Prevailing Party for its reasonable attorney's fees, filing fees, and court costs. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Landlord shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Event of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Event of Default or resulting breach ($200 is a reasonable minimum per occurrence for such services and consultation).

31.    **Landlord's Access; Showing Premises; Repairs; Solar.** Landlord and Landlord's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Landlord may deem necessary or desirable and the erecting, using and maintaining of, among other things desired by Landlord, utilities, services, security systems, communication systems, fire sprinklers or detection systems, solar power systems, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Tenant's use of the Premises. All such activities shall be without abatement of Rent or liability to Tenant. Without limiting the generality of the foregoing, Tenant agrees and understands that Landlord shall have the right (provided that the exercise of Landlord's rights does not adversely affect Tenant's use and occupancy of the Premises or subject Tenant to additional costs), without Tenant's consent, to place a solar electric generating system, a satellite system and/or other system and/or equipment on the roof of the Building (together with appurtenances within the Premises as reasonably required) or enter into a lease(s) for the roof of the Building whereby such roof tenant(s) shall have the right to install any such systems on the roof of the Building, and Landlord and its agents shall have access to the Premises and roof to accomplish the foregoing.

32.    **Signs; Press Releases.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Any signage shall be at Tenant's sole cost and expense. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Tenant shall not place any sign upon the Project without Landlord's prior written consent. All signs must comply with all Legal Requirements. Landlord shall have the right to publicize Landlord and Tenant's relationship regarding this Lease.

33.    **Termination; Merger.** Unless specifically stated otherwise in writing by Landlord, the voluntary or other surrender of this Lease by Tenant, the mutual termination or cancellation hereof, or a termination hereof by Landlord for breach by Tenant, shall automatically terminate any sublease or lesser estate in the Premises provided, however, that Landlord may elect to continue any one or all existing subtenancies. Landlord's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Landlord's election to have such event constitute the termination of such interest.

34.    **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a party is required to an act by or for the other party, such consent shall not be unreasonably withheld or delayed. Landlord's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Tenant for any Landlord consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Material or a so-called "landlord-lender" agreement, shall be paid by Tenant upon receipt of an invoice and supporting documentation therefor. The failure to specify herein any particular condition to Landlord's consent shall not preclude the imposition by Landlord at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.

35.    **Guarantor.**

A.    **Execution.** The Guarantors, if any, shall each execute Landlord's standard guaranty form.

B.    **Event of Default.** It shall constitute an Event of Default of the Tenant if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

36.    **Quiet Possession.** If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

37.    **Security Measures.** Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of third parties. Tenant acknowledges and agrees that, if Landlord patrols the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

38.    **Reservations.** Landlord reserves the right: (a) to grant, without the consent or joinder of Tenant, such easements, rights and dedications that Landlord deems necessary, (b) to cause the recordation of parcel maps and restrictions, and (c) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Tenant. Tenant agrees to sign any documents reasonably requested by Landlord to effectuate such rights.

39.    **Authority; Multiple Parties; Execution.**

A.    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

B.    If and when included within the term **"Tenant,"** as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant. Additionally, if there be more than one Tenant, then each Tenant hereunder agrees that (a) the act of any one Tenant, acting alone, shall be sufficient to bind all Tenants with respect to their respective rights and obligations under this Lease, and (b) Landlord shall have the unconditional right to rely upon the act of any one Tenant as being binding upon all Tenant's without any obligation to inquire as to the authority of the Tenant with whom Landlord is dealing.

C.    This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Lease. Execution copies of this Lease may be delivered by facsimile or email, and the parties hereto agree to accept and be bound by facsimile signatures or scanned signatures transmitted via email hereto, which signatures shall be considered as original signatures with the transmitted Lease having the same binding effect as an original signature on an original Lease. At the request of either party, any facsimile document or scanned document transmitted via email is to be re-executed in original form by the party who executed the original facsimile document or scanned document. Neither party may raise the use of a facsimile machine or scanned document or the fact that any signature was transmitted through the use of a facsimile machine or email as a defense to the enforcement of this Lease.

4013376.8
24396-991



INITIALS

40.     Conflict. Any conflict between the Basic Lease Provisions of this Lease and the other Sections of this standard base Lease, the Basic Lease Provisions shall control. All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof.  In the event of any conflict between such exhibits or addenda and the other terms of the standard base Lease, such exhibits or addenda shall control.

41.     Offer. This Lease is not intended to be binding until executed and delivered by all Parties hereto. The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

42.     Amendments. This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Tenant's obligations hereunder, Tenant agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

43.     Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS LEASE.

44.     Accessibility; Americans with Disabilities Act; CASp Disclosure.

        A.     CASp Statement. Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp).

        B.     No Representation or Warranty.  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Tenant's specific use of the Premises, Landlord makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Tenant's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Tenant agrees to make any such necessary modifications and/or additions at Tenant's expense.

        C.     California Law Disclosure.  A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

        D.     Acknowledgement. Landlord and Tenant hereby mutually agree that in the event a CASp inspection is requested by Tenant, the fee for the CASp inspection and the cost of making any repairs necessary to correct violations of construction-related accessibility standards noted in the CASp inspection shall be paid by Tenant.

45.     REIT Provisions.  Tenant understands that, in order for Landlord and/or an indirect owner of Landlord to qualify as a REIT, the following requirements (the "REIT Requirements") must be satisfied:

        A.     Subleasing. Anything contained in this Lease to the contrary notwithstanding, Tenant shall not sublet the Premises on any basis such that the rent or other amounts to be paid by the sublessee thereunder would be based, in whole or in part, on either (a) the net income or profits derived by the business activities of the proposed sublessee, or (b) any other formula such that any portion of the Rent would fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code, or any similar or successor provision hereto.

        B.     Personal Property Limitation. Anything contained in the Lease to the contrary notwithstanding, the average of the fair market values of the items of personal property that are leased to Tenant under the Lease at the beginning and at the end of any year shall not exceed fifteen percent (15%) of the average of the aggregate fair market values of the leased property at the beginning and at the end of such year (the "Personal Property Limitation"). If Landlord reasonably anticipates that the Personal Property Limitation will be exceeded with respect to the leased property for any year, Landlord shall notify Tenant, and Tenant either (a) shall purchase at fair market value any personal property anticipated to be in excess of the Personal Property Limitation ("Excess Personal Property") either from Landlord or a third party, or (b) shall lease the Excess Personal Property from a third party.  In either case, Tenant's Base Rent obligation shall be equitably adjusted. Notwithstanding anything to the contrary set forth above, Tenant shall not be responsible in any way for determining whether Tenant has exceeded or will exceed the Personal Property Limitation and shall not be liable to Landlord or any of its shareholders in the event that the Personal Property Limitation is exceeded, as long as Tenant meets its obligation to acquire or lease any Excess Personal Property as provided above.  This section is intended to ensure that the Rent qualifies as "rents from real property," within the meaning of Section 856(d) of the Internal Revenue Code, or any similar or successor provisions thereto, and shall be interpreted in a manner consistent with such intent.

        C.     REIT Requirements. Tenant agrees to use its reasonable efforts to cause its affiliates, to cooperate in good faith with Landlord to ensure that the terms of this Section are satisfied.  Tenant agrees to use reasonable efforts to cause its affiliates, upon request by Landlord to take reasonable action necessary to ensure compliance with all REIT Requirements.  If Tenant becomes aware that the REIT Requirements are not, or will not be, satisfied, Tenant shall notify, or use reasonable efforts to cause its affiliates to notify Landlord of such noncompliance.  Notwithstanding anything herein to the contrary, in the event that Tenant defaults in its obligations under this Section with respect to the REIT Requirements and fails to cure the same within 30 days after written notice from Landlord, then Landlord's sole remedy for Tenant's breach of its obligations under this Section shall be to terminate the Lease (provided, however, that the preceding shall not limit Landlord's right to pursue all other available remedies in connection with an Event of Default by Tenant of any other obligations or provisions under the Lease other than those set forth in this Section).

46.     Interpretation.  This Lease shall be deemed to have been drafted by both parties and shall not be interpreted against any person as drafter.  In addition, prior drafts of this Lease or any letters of intent regarding the same shall not be used in any way to interpret the provisions hereof.

47.     Force Majeure. Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

48.     Arbitration.

        A.     Subject to (B) below, in the event of any dispute or disagreement between the parties as to the validity, construction, enforceability or performance of this Lease which cannot be resolved by the mutual agreement of the parties, and mindful of the high cost of litigation, not only in dollars but time and energy as well, the parties intend to and do hereby establish a quick, final and binding out-of-court dispute resolution procedure to be followed in the unlikely event any controversy should arise out of or concerning the performance of this Lease. Accordingly, the parties do hereby covenant and agree as follows:

        (1)     Any controversy, dispute, or claim of whatever nature arising out of, in connection with, or in relation to the interpretation, performance or breach of this Lease, including any claim based on contract, tort, or statute, shall be determined, at the request of any party to this Lease by binding arbitration before a retired judge of the applicable court of jurisdiction affiliated with Judicial Arbitration & Mediation Services, Inc. ("JAMS") conducted at a location determined by an arbitrator in the County of Los Angeles, State of California administered by and in accordance with the then existing Rules of Practice and Procedure of JAMS, and judgment upon any award rendered by the arbitrator(s) may be entered by any state or federal Court having jurisdiction thereof.

        (2)     The provisions of California Code of Civil Procedures Section 1283.05 or its successor section(s) are incorporated in and made a part of this Lease.  Depositions may be taken and discovery may be obtained in any arbitration under this Lease in accordance with such section(s).

        (3)     The arbitrator shall determine which is the prevailing party and may include in the award that party's costs and reasonable attorneys' fees.

        (4)     As soon as practicable after selection of the arbitrator, the arbitrator or such arbitrator's designated representative shall determine a reasonable estimate of anticipated fees and costs of the arbitrator, and render a statement to each party setting forth that party's pro



INITIALS

40.     **Conflict.** Any conflict between the Basic Lease Provisions of this Lease and the other Sections of this standard base Lease, the Basic Lease Provisions shall control. All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the other terms of the standard base Lease, such exhibits or addenda shall control.

41.     **Offer.** This Lease is not intended to be binding until executed and delivered by all Parties hereto. The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties

42.     **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Tenant's obligations hereunder, Tenant agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

43.     **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS LEASE.

44.     **Accessibility; Americans with Disabilities Act; CASp Disclosure.**

    A.     **CASp Statement.** Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp).

    B.     **No Representation or Warranty.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Tenant's specific use of the Premises, Landlord makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Tenant's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Tenant agrees to make any such necessary modifications and/or additions at Tenant's expense.

    C.     **California Law Disclosure.** A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

    D.     **Acknowledgement.** Landlord and Tenant hereby mutually agree that in the event a CASp inspection is requested by Tenant, the fee for the CASp inspection and the cost of making any repairs necessary to correct violations of construction-related accessibility standards noted in the CASp inspection shall be paid by Tenant.

45.     **REIT Provisions.** Tenant understands that, in order for Landlord and/or an indirect owner of Landlord to qualify as a REIT, the following requirements (the "REIT Requirements") must be satisfied:

    A.     **Subleasing.** Anything contained in this Lease to the contrary notwithstanding, Tenant shall not sublet the Premises on any basis such that the rent or other amounts to be paid by the sublessee thereunder would be based, in whole or in part, on either (a) the net income or profits derived by the business activities of the proposed sublessee, or (b) any other formula such that any portion of the Rent would fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code, or any similar or successor provision hereto.

    B.     **Personal Property Limitation.** Anything contained in the Lease to the contrary notwithstanding, the average of the fair market values of the items of personal property that are leased to Tenant under the Lease at the beginning and at the end of any year shall not exceed fifteen percent (15%) of the average of the aggregate fair market values of the leased property at the beginning and at the end of such year (the "Personal Property Limitation"). If Landlord reasonably anticipates that the Personal Property Limitation will be exceeded with respect to the leased property for any year, Landlord shall notify Tenant, and Tenant either (a) shall purchase at fair market value any personal property anticipated to be in excess of the Personal Property Limitation (the "Excess Personal Property") either from Landlord or a third party, or (b) shall lease the Excess Personal Property from a third party. In either case, Tenant's Base Rent obligation shall be equitably adjusted. Notwithstanding anything to the contrary set forth above, Tenant shall not be responsible in any way for determining whether Tenant has exceeded or will exceed the Personal Property Limitation and shall not be liable to Landlord or any of its shareholders in the event that the Personal Property Limitation is exceeded, as long as Tenant meets its obligation to acquire or lease any Excess Personal Property as provided above. This section is intended to ensure that the Rent qualifies as "rents from real property," within the meaning of Section 856(d) of the Internal Revenue Code, or any similar or successor provisions thereto, and shall be interpreted in a manner consistent with such intent.

    C.     **REIT Requirements.** Tenant agrees to use its reasonable efforts to cause its affiliates, to cooperate in good faith with Landlord to ensure that the terms of this Lease and the REIT Requirements are satisfied. Tenant agrees to use reasonable efforts to cause its affiliates, upon request by Landlord to take reasonable action necessary to ensure compliance with all REIT Requirements. If Tenant becomes aware that the REIT Requirements are not, or will not be, satisfied, Tenant shall notify, or use reasonable efforts to cause its affiliates to notify Landlord of such noncompliance. Notwithstanding anything herein to the contrary, in the event that Tenant defaults in its obligations under this Section with respect to the REIT Requirements and fails to cure the same within 30 days after written notice from Landlord, then Landlord's sole remedy for Tenant's breach of its obligations under this Section shall be to terminate the Lease (provided, however, that the preceding shall not limit Landlord's right to pursue all other available remedies in connection with an Event of Default by Tenant of any other obligations or provisions under the Lease other than those set forth in this Section).

46.     **Interpretation.** This Lease shall be deemed to have been drafted by both parties and shall not be interpreted against any person as drafter. In addition, prior drafts of this Lease or any letters of intent regarding the same shall not be used in any way to interpret the provisions hereof.

47.     **Force Majeure.** Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

48.     **Arbitration.**

    A.     Subject to (B) below, in the event of any dispute or disagreement between the parties as to the validity, construction, enforceability or performance of this Lease which cannot be resolved by the mutual agreement of the parties, and mindful of the high cost of litigation, not only in dollars but time and energy as well, the parties intend to and do hereby establish a quick, final and binding out-of-court dispute resolution procedure to be followed in the unlikely event any controversy should arise out of or concerning the performance of this Lease. Accordingly, the parties do hereby covenant and agree as follows:

        (1)     Any controversy, dispute, or claim of whatever nature arising out of, in connection with, or in relation to the interpretation, performance or breach of this Lease, including any claim based on contract, tort, or statute, shall be determined, at the request of any party to this Lease by binding arbitration before a retired judge or the applicable court of jurisdiction affiliated with Judicial Arbitration & Mediation Services, Inc. ("JAMS") conducted at a location determined by an arbitrator in the County of Los Angeles, State of California administered by and in accordance with the then existing Rules of Practice and Procedure of JAMS, and judgment upon any award rendered by the arbitrator(s) may be entered by any state or federal Court having jurisdiction thereof.

        (2)     The provisions of California Code of Civil Procedures Section 1283.05 or its successor section(s) are incorporated in and made a part of this Lease. Depositions may be taken and discovery may be obtained in any arbitration under this Lease in accordance with such section(s).

        (3)     The arbitrator shall determine which is the prevailing party and may include in the award that party's costs and reasonable attorneys' fees.

        (4)     As soon as practicable after selection of the arbitrator, the arbitrator or such arbitrator's designated representative shall determine a reasonable estimate of anticipated fees and costs of the arbitrator, and render a statement to each party setting forth that party's pro

4013376.8
24396-991

INITIALS

rata share of such fees and costs. Thereafter each party shall, within 10 days of receipt of such statement, deposit such sum with the arbitrator. Failure of any party to make such a deposit shall not otherwise serve to abate, stay or suspend the arbitration proceedings.

B.       Any party shall have the right to apply for and obtain a temporary restraining order or other temporary or permanent injunctive or equitable relief from a court of competent jurisdiction to enforce the provisions hereof or to otherwise protect its rights under this Section. Notwithstanding the foregoing, the following claims, disputes or disagreements under this Lease are expressly excluded from the arbitration procedures set forth herein: (a) disputes for which a different resolution determination is specifically set forth in this Lease; (b) all claims by either party which (1) seek anything other than enforcement or determination of rights under this Lease or (2) are primarily founded upon matters of fraud, willful misconduct, bad faith or any other allegations of tortious action, and seek the award of punitive or exemplary damages; (c) claims relating to (1) Landlord's exercise of any unlawful detainer rights pursuant to applicable Legal Requirements or (2) rights or remedies used by Landlord to gain possession of the Premises or terminate Tenant's right of possession to the Premises, all of which disputes shall be resolved by suit filed in the applicable court of jurisdiction, the decision of which court shall be subject to appeal pursuant to applicable Legal Requirements; and (d) any claim or dispute that is within the jurisdiction of Small Claims Court.

C.       The provisions of this Section shall not limit, require the postponement of, or in any other way preclude the exercise of any right or remedies otherwise enjoyed by any party to this Lease under the provisions hereof.

D.       Tenant shall not interpose any counterclaims of any nature in any unlawful detainer or eviction proceeding (unless such counterclaim is compulsory).

49.      Miscellaneous.

A.       Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

B.       Upon receipt of written request from Landlord, Tenant, at Tenant's sole cost and expense, shall deliver to Landlord data regarding the electricity consumed in the operation of the Premises (the "Energy Data") for purposes of regulatory compliance, manual and automated benchmarking, energy management, building environmental performance labeling and other related purposes, including but not limited, to the Environmental Protection Agency's Energy Star rating system and other energy benchmarking systems. Landlord shall use commercially reasonable efforts to utilize automated data transmittal services offered by utility companies to access the Energy Data. Landlord shall not publicly disclose Energy Data without Tenant's prior written consent. Landlord may, however, disclose Energy Data that has been modified, combined or aggregated in a manner such that the resulting data is not exclusively attributable to Tenant.

C.       Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

D.       LANDLORD HEREBY DISCLOSES TO TENANT THAT, BASED ON THE AGE OF THE BUILDING, LANDLORD HAS REASONABLE CAUSE TO BELIEVE THAT ASBESTOS-CONTAINING MATERIALS MAY BE PRESENT IN THE BUILDING AND THE PREMISES. TENANT ACKNOWLEDGES THAT TENANT IS FULLY FAMILIAR WITH THE BUILDING AND PREMISES IN LIGHT OF ITS PRIOR OWNERSHIP AND OCCUPANCY AND THAT LANDLORD HAS SATISFIED ITS OBLIGATION TO NOTIFY TENANT OF THE PRESENCE OF ASBESTOS-CONTAINING MATERIALS IN THE BUILDING PURSUANT TO CALIFORNIA HEALTH & SAFETY CODE SECTION 25359.7, AND TENANT SHALL NOT DISTURB ANY MATERIALS THAT MAY CONTAIN ASBESTOS.

E.       TENANT HEREBY WAIVES ANY AND ALL RIGHTS UNDER SECTIONS 1511, 1951.7 AND 1993 OF THE CALIFORNIA CIVIL CODE AND SECTIONS 1174 AND 1265.130 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.

F.       Tenant represents and warrants to Landlord that none of Tenant, the entities or individuals constituting Tenant, the entities or individuals owning or controlling Tenant, or the entities or individuals owned or controlled by Tenant are among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists

[SIGNATURE PAGE FOLLOWS]



INITIALS

rata share of such fees and costs. Thereafter each party shall, within 10 days of receipt of such statement, deposit such sum with the arbitrator. Failure of any party to make such a deposit shall not otherwise serve to abate, stay or suspend the arbitration proceedings.

B.　　Any party shall have the right to apply for and obtain a temporary restraining order or other temporary or permanent injunctive or equitable relief from a court of competent jurisdiction to enforce the provisions hereof or to otherwise protect its rights under this Section. Notwithstanding the foregoing, the following claims, disputes or disagreements under this Lease are expressly excluded from the arbitration procedures set forth herein: (a) disputes for which a different resolution determination is specifically set forth in this Lease; (b) all claims by either party which (1) seek anything other than enforcement or determination of rights under this Lease or (2) are primarily founded upon matters of fraud, willful misconduct, bad faith or any other allegations of tortious action, and seek the award of punitive or exemplary damages; (c) claims relating to (1) Landlord's exercise of any unlawful detainer rights pursuant to applicable Legal Requirements or (2) rights or remedies used by Landlord to gain possession of the Premises or terminate Tenant's right of possession to the Premises, all of which disputes shall be resolved by suit filed in the applicable court of jurisdiction, the decision of which court shall be subject to appeal pursuant to applicable Legal Requirements; and (d) any claim or dispute that is within the jurisdiction of Small Claims Court.

C.　　The provisions of this Section shall not limit, require the postponement of, or in any other way preclude the exercise of any right or remedies otherwise enjoyed by any party to this Lease under the provisions hereof.

D.　　Tenant shall not interpose any counterclaims of any nature in any unlawful detainer or eviction proceeding (unless such counterclaim is compulsory).

49.　Miscellaneous.

A.　　Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

B.　　Upon receipt of written request from Landlord, Tenant, at Tenant's sole cost and expense, shall deliver to Landlord data regarding the electricity consumed in the operation of the Premises (the "Energy Data") for purposes of regulatory compliance, manual and automated benchmarking, energy management, building environmental performance labeling and other related purposes, including but not limited, to the Environmental Protection Agency's Energy Star rating system and other energy benchmarking systems. Landlord shall use commercially reasonable efforts to utilize automated data transmittal services offered by utility companies to access the Energy Data. Landlord shall not publicly disclose Energy Data without Tenant's prior written consent. Landlord may, however, disclose Energy Data that has been modified, combined or aggregated in a manner such that the resulting data is not exclusively attributable to Tenant.

C.　　Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

D.　　LANDLORD HEREBY DISCLOSES TO TENANT THAT, BASED ON THE AGE OF THE BUILDING, LANDLORD HAS REASONABLE CAUSE TO BELIEVE THAT ASBESTOS-CONTAINING MATERIALS MAY BE PRESENT IN THE BUILDING AND THE PREMISES. TENANT ACKNOWLEDGES THAT TENANT IS FULLY FAMILIAR WITH THE BUILDING AND PREMISES IN LIGHT OF ITS PRIOR OWNERSHIP AND OCCUPANCY AND THAT LANDLORD HAS SATISFIED ITS OBLIGATION TO NOTIFY TENANT OF THE PRESENCE OF ASBESTOS-CONTAINING MATERIALS IN THE BUILDING PURSUANT TO CALIFORNIA HEALTH & SAFETY CODE SECTION 25359.7, AND TENANT SHALL NOT DISTURB ANY MATERIALS THAT MAY CONTAIN ASBESTOS.

E.　　TENANT HEREBY WAIVES ANY AND ALL RIGHTS UNDER SECTIONS 1511, 1951.7 AND 1993 OF THE CALIFORNIA CIVIL CODE AND SECTIONS 1174 AND 1265.130 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.

F.　　Tenant represents and warrants to Landlord that none of Tenant, the entities or individuals constituting Tenant, the entities or individuals owning or controlling Tenant, or the entities or individuals owned or controlled by Tenant are among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists

[SIGNATURE PAGE FOLLOWS]

4013376.8
24396-991



INITIALS

The parties hereto have executed this Lease on the dates specified about their respective signatures.

**Landlord:**                                          **Tenant:**

REXFORD INDUSTRIAL REALTY, L.P.,
a Maryland limited partnership                          Stephen Masley

By:  Rexford Industrial Realty, Inc.,
     a Maryland corporation,
     its General Partner

By: _____

Printed:  Howard Schwimmer

Title:  Co- CEO


Address: 11620 Wilshire Boulevard, Suite 1000          Address:  10750 Wilshire Blvd. #702
         Los Angeles, California 90025                           Los Angeles, California  90024
Telephone: +1 (310) 966-1680                           Telephone: _____

**With a Copy to:**

Attn: General Counsel
C/O: Rexford Industrial
Address: 11620 Wilshire Boulevard, Suite 1000
         Los Angeles, California 90025

The parties hereto have executed this Lease on the dates specified about their respective signatures.

**Landlord:**

REXFORD INDUSTRIAL REALTY, L.P.,
a Maryland limited partnership

By:  Rexford Industrial Realty, Inc.,
a Maryland corporation,
its General Partner

By: _____

Printed: _____

Title: _____

Address: 11620 Wilshire Boulevard, Suite 1000
Los Angeles, California 90025
Telephone: +1 (310) 966-1680

With a Copy to:

Attn: General Counsel
C/O: Rexford Industrial
Address: 11620 Wilshire Boulevard, Suite 1000
Los Angeles, California 90025

**Tenant:**

Stephen Mastey

661-857-4814 x 231

Address: 10750 Wilshire Blvd. #702
Los Angeles, California 90024
Telephone: _____

4013376.8
24396-991

INITIALS

Exhibit "A"

SITE PLAN

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
BETWEEN
Rexford Industrial Realty, L.P., a Maryland limited partnership
and
Stephen Mastey



TEMPORARY DOCK-HIGH LOADING

SUBJECT PREMISES

Not to scale. Does not constitute a representation or warranty regarding the Project or any portion thereof, and Landlord reserves the
right to modify any portion of the Project in its sole discretion as provided in the Lease.

Exhibit "A"

SITE PLAN

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
BETWEEN
Rexford Industrial Realty, L.P., a Maryland limited partnership
and
Stephen Mastey



EXISTING GROUND LEVEL PLAN

EXISTING UPPER LEVEL FLOOR PLAN

TEMPORARY DOCK-HIGH LOADING

SUBJECT PREMISES

Not to scale. Does not constitute a representation or warranty regarding the Project or any portion thereof, and Landlord reserves the
right to modify any portion of the Project in its sole discretion as provided in the Lease.



EXHIBIT "B"

PROJECT RULES AND REGULATIONS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
BETWEEN
Rexford Industrial Realty, L.P., a Maryland limited partnership
and
Stephen Mastey

Rules and Regulations

1.       The sidewalk, entries, driveways and drive aisles of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2.       Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project without Landlord's prior written consent.

3.       Except for guide, signal, or seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Project.

4.       Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5.       If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted.  Any such installation or connection shall be made at Tenant's expense.

6.       Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease.  The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited.  Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.       Parking any type of recreational vehicles is specifically prohibited on or about the Project.  Further, parking any type of trucks, trailers or other vehicles in the Building is specifically prohibited.  In the event that a vehicle is disabled, it shall be removed within 48 hours.  There shall be no "For Sale" or other advertising signs on or about any parked vehicle.  All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings.  All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord or in the Lease.

8.       Tenant shall maintain the Premises free from rodents, insects and other pests.

9.       Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10.      Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.  Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11.      Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12.      Tenant shall not permit storage outside the Premises, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13.      All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14.      No auction, public or private, will be permitted on the Premises or the Project.

15.      No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16.      The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease.  No gaming devices shall be operated in the Premises.

17.      Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity.  Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18.      Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19.      Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20.      Tenant shall not permit smoking in the office areas of the Premises.

21.      Tenant shall not conduct any loading or unloading of materials or supplies outside of the areas specifically designated by Landlord for such activities.

EXHIBIT "B"

PROJECT RULES AND REGULATIONS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
BETWEEN
Rexford Industrial Realty, L.P., a Maryland limited partnership
and
Stephen Mastoy

Rules and Regulations

1.    The sidewalk, entries, driveways and drive aisles of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2.    Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project without Landlord's prior written consent.

3.    Except for guide, signal, or seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Project.

4.    Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5.    If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted.  Any such installation or connection shall be made at Tenant's expense.

6.    Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease.  The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited.  Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.    Parking any type of recreational vehicles is specifically prohibited on or about the Project.  Further, parking any type of trucks, trailers or other vehicles in the Building is specifically prohibited.  In the event that a vehicle is disabled, it shall be removed within 48 hours.  There shall be no "For Sale" or other advertising signs on or about any parked vehicle.  All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings.  All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord or in the Lease.

8.    Tenant shall maintain the Premises free from rodents, insects and other pests.

9.    Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10.    Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.  Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11.    Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12.    Tenant shall not permit storage outside the Premises, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13.    All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14.    No auction, public or private, will be permitted on the Premises or the Project.

15.    No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16.    The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease.  No gaming devices shall be operated in the Premises.

17.    Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity.  Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18.    Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19.    Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20.    Tenant shall not permit smoking in the office areas of the Premises.

21.    Tenant shall not conduct any loading or unloading of materials or supplies outside of the areas specifically designated by Landlord for such activities.



EXHIBIT "C"

FORM OF TENANT CONTACT INFORMATION SHEET



**Rexford Industrial**

## Tenant Contact Information

Please complete and return this form immediately to:

Rexford Industrial Realty, L.P.            Tel (310) 966-1680
11620 Wilshire Boulevard, Suite 1000       E-Fax (310) 405-7646
Los Angeles, California 90025

### Tenant Contact Information

1.  Tenant Full Legal Name:_____
    Office Main: (_____)_____      Mobile: (_____)_____
    Email Address: _____
    Emergency Contact: _____   Emergency Phone Number (_____)_____
2.  Leased Premises Address:_____
3.  On-Site Contact Name/Title:_____
    Office Main: (_____)_____      Mobile: (_____)_____
    Email Address: _____
4.  Accounts Payable Contact Name:_____
    Office Main: (_____)_____      Mobile: (_____)_____
    Email Address: _____
    Mailing Address (if different):_____

### Tenant Business Information

5.  Nature of Business:_____ NAICS (6-digit) Code for Business:_____
6.  Total Number of Employees at this location:_____
7.  Product or Service is Used by **Consumers** or by **Other Businesses** (circle one)
8.  Is any portion of your business involved in producing or selling goods or services via the Internet or Amazon/ eBay/ Craigslist? **Yes** or **No** (circle one)
    If yes, approximately what percent is sold to consumers _____
    If yes, approximately what percent is sold to businesses _____
9.  Is any portion of your business involved in manufacturing/warehousing any products/services that are eventually sold via the Internet? **Yes** or **No** (circle one)
    If yes, approximately what percent _____
10. What percentage of your business do you expect to experience sales growth due to the Internet/e-commerce over the next 1-2 years _____
11. Where does the Product/Service Originate From?_____
12. Percent of Product or Service that is Sourced in CA _____
13. Percent of Product or Service that is Sourced in USA but outside CA _____
14. Percent of Product or Service that is Imported from outside USA _____
15. Where is the Product/Service distributed to? _____
16. Percent of Product or Service that is distributed to or consumed in CA _____
17. Percent of Product or Service that is distributed to or consumed in USA, but outside of CA _____
18. Percent of Product or Service that is exported to outside of USA _____

    Signature:_____     Date:_____

EXHIBIT "C"

FORM OF TENANT CONTACT INFORMATION SHEET



**Rexford Industrial**

## Tenant Contact Information

**Please complete and return this form immediately to:**

Rexford Industrial Realty, L.P.                      Tel (310) 966-1680
11620 Wilshire Boulevard, Suite 1000                 E-Fax (310) 405-7646
Los Angeles, California 90025

### Tenant Contact Information

1. Tenant Full Legal Name:_____
   Office Main: (_____)_____   Mobile: (_____)_____
   Email Address:_____
   Emergency Contact:_____   Emergency Phone Number (_____)_____
2. Leased Premises Address:_____
3. On-Site Contact Name/Title:_____
   Office Main: (_____)_____   Mobile: (_____)_____
   Email Address:_____
4. Accounts Payable Contact Name:_____
   Office Main: (_____)_____   Mobile: (_____)_____
   Email Address:_____
   Mailing Address (if different):_____

### Tenant Business Information

5. Nature of Business:_____ NAICS (6-digit) Code for Business:_____
6. Total Number of Employees at this location:_____
7. Product or Service is Used by **Consumers** or by **Other Businesses** (circle one)
8. Is any portion of your business involved in producing or selling goods or services via the Internet or Amazon/ eBay/ Craigslist? **Yes** or **No** (circle one)
   If yes, approximately what percent is sold to consumers _____
   If yes, approximately what percent is sold to businesses _____
9. Is any portion of your business involved in manufacturing/warehousing any products/services that are eventually sold via the Internet? **Yes** or **No** (circle one)
   If yes, approximately what percent _____
10. What percentage of your business do you expect to experience sales growth due to the Internet/e-commerce over the next 1-2 years _____
11. Where does the Product/Service Originate From?_____
12. Percent of Product or Service that is Sourced in CA _____
13. Percent of Product or Service that is Sourced in USA but outside CA _____
14. Percent of Product or Service that is Imported from outside USA _____
15. Where is the Product/Service distributed to? _____
16. Percent of Product or Service that is distributed to or consumed in CA _____
17. Percent of Product or Service that is distributed to or consumed in USA, but outside of CA _____
18. Percent of Product or Service that is exported to outside of USA _____

Signature:_____   Date: 3/10/19

EXHIBIT "D"

ACM NOTIFICATION

This Exhibit is attached to and made a part of the Lease by and between Rexford Industrial Realty, L.P., a Maryland limited partnership ("Landlord"), and Henri Masley, as Trustee of the Henri Masley Living Trust, dated April 21, 1978, and as amended February 28, 1986 ("Tenant"), for space in the building located at 25413 Rye Canyon Road, Santa Clarita, California (the "Building").

Asbestos-containing materials ("ACMs") were historically commonly used in the construction of commercial buildings across the country. ACMs were commonly used because of their beneficial qualities; ACMs are fire-resistant and provide good noise and temperature insulation.

Some common types of ACMs include surfacing materials (such as spray-on fireproofing, stucco, plaster and textured paint), flooring materials (such as vinyl floor tile and vinyl floor sheeting) and their associated mastics, carpet mastic, thermal system insulation (such as pipe or duct wrap, boiler wrap and cooling tower insulation), roofing materials, drywall, drywall joint tape and drywall joint compound, acoustic ceiling tiles, transite board, base cove and associated mastic, caulking, window glazing and fire doors. These materials are not required under law to be removed from any building (except prior to demolition and certain renovation projects). Moreover, ACMs generally are not thought to present a threat to human health unless they cause a release of asbestos fibers into the air, which does not typically occur unless (1) the ACMs are in deteriorated condition, or (2) the ACMs have been significantly disturbed (such as through abrasive cleaning, or maintenance or renovation activities).

It is possible that some of the various types of ACMs noted above (or other types) are present at various locations in the Building. Anyone who finds any such materials in the Building should assume them to contain asbestos unless those materials are properly tested and found to be otherwise. In addition, under applicable law, certain of these materials are required to be presumed to contain asbestos in the Building if the Building was built prior to 1981 (these materials are typically referred to as "Presumed Asbestos Containing Materials" or "PACM"). PACM consists of thermal system insulation and surfacing material found in buildings constructed prior to 1981, and asphalt or vinyl flooring installed prior to 1981. If the Building was built prior to 1981 and any thermal system insulation, asphalt or vinyl flooring or surfacing materials are found to be present in the Building, such materials must be considered PACM unless properly tested and found otherwise. In addition, Landlord has identified the presence of certain ACMs in the Building. For information about the specific types and locations of these identified ACMs, please contact the Building manager. The Building Manager maintains records of the Building's asbestos information including any Building asbestos surveys, sampling and abatement reports. This information is maintained as part of Landlord's asbestos Operations and Maintenance Plan ("O&M Plan").

The O&M Plan is designed to minimize the potential of any harmful asbestos exposure to any person in the Building. Because Landlord is not a physician, scientist or industrial hygienist, Landlord has no special knowledge of the health impact of exposure to asbestos. Therefore, Landlord hired an independent environmental consulting firm to prepare an O&M Plan. The O&M Plan includes a schedule of actions to be taken in order to (1) maintain any building ACMs in good condition, and (2) to prevent any significant disturbance of such ACMs. Appropriate Landlord personnel receive regular periodic training on how to properly administer the O&M Plan.

The O&M Plan describes the risks associated with asbestos exposure and how to prevent such exposure. The O&M Plan describes those risks, in general, as follows: asbestos is not a significant health concern unless asbestos fibers are released and inhaled. If inhaled, asbestos fibers can accumulate in the lungs and, as exposure increases, the risk of disease (such as asbestosis and cancer) increases. However, measures taken to minimize exposure and consequently minimize the accumulation of fibers, can reduce the risk of adverse health effects.

The O&M Plan also describes a number of activities which should be avoided in order to prevent a release of asbestos fibers. In particular, some of the activities which may present a health risk (because those activities may cause an airborne release of asbestos fibers) include moving, drilling, boring or otherwise disturbing ACMs. Consequently, such activities should not be attempted by any person not qualified to handle ACME. In other words, the approval of Building management must be obtained prior to engaging in any such activities. Please contact the Building manager for more information in this regard. A copy of the written O&M Plan is located in the Building Management Office and, upon your request, will be made available to tenants for you to review and copy during regular business hours.

Because of the potential or presumed presence of ACM in the Building, we are also providing the following warning, which is commonly known as a California Proposition 65 warning: WARNING: This building contains asbestos, a chemical known to the State of California to cause cancer.

Please contact the Building manager with any questions regarding the contents of this notification.

EXHIBIT "D"

ACM NOTIFICATION

This Exhibit is attached to and made a part of the Lease by and between Rexford Industrial Realty, L.P., a Maryland limited partnership ("Landlord"), and Henri Mastey, as Trustee of the Henri Mastey Living Trust, dated April 21, 1978, and as amended February 28, 1986 ("Tenant"), for space in the building located at 25413 Rye Canyon Road, Santa Clarita, California (the "Building").

Asbestos-containing materials ("ACMs") were historically commonly used in the construction of commercial buildings across the country. ACMs were commonly used because of their beneficial qualities; ACMs are fire-resistant and provide good noise and temperature insulation.

Some common types of ACMs include surfacing materials (such as spray-on fireproofing, stucco, plaster and textured paint), flooring materials (such as vinyl floor tile and vinyl floor sheeting) and their associated mastics, carpet mastic, thermal system insulation (such as pipe or duct wrap, boiler wrap and cooling tower insulation), roofing materials, drywall, drywall joint tape and drywall joint compound, acoustic ceiling tiles, transite board, base cove and associated mastic, caulking, window glazing and fire doors. These materials are not required under law to be removed from any building (except prior to demolition and certain renovation projects). Moreover, ACMs generally are not thought to present a threat to human health unless they cause a release of asbestos fibers into the air, which does not typically occur unless (1) the ACMs are in deteriorated condition, or (2) the ACMs have been significantly disturbed (such as through abrasive cleaning, or maintenance or renovation activities).

It is possible that some of the various types of ACMs noted above (or other types) are present at various locations in the Building. Anyone who finds any such materials in the Building should assume them to contain asbestos unless those materials are properly tested and found to be otherwise. In addition, under applicable law, certain of these materials are required to be presumed to contain asbestos in the Building if the Building was built prior to 1981 (these materials are typically referred to as "Presumed Asbestos Containing Materials" or "PACM"). PACM consists of thermal system insulation and surfacing material found in buildings constructed prior to 1981, and asphalt or vinyl flooring installed prior to 1981. If the Building was built prior to 1981 and any thermal system insulation, asphalt or vinyl flooring or surfacing materials are found to be present in the Building, such materials must be considered PACM unless properly tested and found otherwise. In addition, Landlord has identified the presence of certain ACMs in the Building. For information about the specific types and locations of these identified ACMs, please contact the Building manager. The Building Manager maintains records of the Building's asbestos information including any Building asbestos surveys, sampling and abatement reports. This information is maintained as part of Landlord's asbestos Operations and Maintenance Plan ("O&M Plan").

The O&M Plan is designed to minimize the potential of any harmful asbestos exposure to any person in the Building. Because Landlord is not a physician, scientist or industrial hygienist, Landlord has no special knowledge of the health impact of exposure to asbestos. Therefore, Landlord hired an independent environmental consulting firm to prepare an O&M Plan. The O&M Plan includes a schedule of actions to be taken in order to (1) maintain any building ACMs in good condition, and (2) to prevent any significant disturbance of such ACMs. Appropriate Landlord personnel receive regular periodic training on how to properly administer the O&M Plan.

The O&M Plan describes the risks associated with asbestos exposure and how to prevent such exposure. The O&M Plan describes those risks, in general, as follows: asbestos is not a significant health concern unless asbestos fibers are released and inhaled. If inhaled, asbestos fibers can accumulate in the lungs and, as exposure increases, the risk of disease (such as asbestosis and cancer) increases. However, measures taken to minimize exposure and consequently minimize the accumulation of fibers, can reduce the risk of adverse health effects

The O&M Plan also describes a number of activities which should be avoided in order to prevent a release of asbestos fibers. In particular, some of the activities which may present a health risk (because those activities may cause an airborne release of asbestos fibers) include moving, drilling, boring or otherwise disturbing ACMs. Consequently, such activities should not be attempted by any person not qualified to handle ACME. In other words, the approval of Building management must be obtained prior to engaging in any such activities. Please contact the Building manager for more information in this regard. A copy of the written O&M Plan is located in the Building Management Office and, upon your request, will be made available to tenants for you to review and copy during regular business hours.

Because of the potential or presumed presence of ACM in the Building, we are also providing the following warning, which is commonly known as a California Proposition 65 warning: WARNING: This building contains asbestos, a chemical known to the State of California to cause cancer.

Please contact the Building manager with any questions regarding the contents of this notification.



# EXHIBIT "B"

**Stephen DermOrganic**

| | |
|---|---|
| **From:** | James Byun <jbyun@rexfordindustrial.com> |
| **Sent:** | Wednesday, August 18, 2021 5:29 PM |
| **To:** | Stephen Mastey |
| **Cc:** | Lulu Hardman; Vanny Kim |
| **Subject:** | RE: Do you want me to pay or to get out? |

Hi Stephen –

Thank you for the email. At this point in time, the Landlord feels that you can't keep up with consistent payments and wishes to proceed with legal. I just checked the ledger and the last time you were current on rent was over a year ago. Additionally, in order to become current, not only would the entire balance be due, but also an additional amount of $44,195.23 to make up the difference in the security deposit that was applied to past due charges.

As for the call or email subject, the past year, Lulu and myself have tried reaching out via text, phone and email on multiple occasions without success. I understand that you did respond after multiple attempts; however, the main issue is still that we feel the account won't be able to come current.

Let me know if you have any questions or would like to get on a call to discuss further. I apologize for the inconvenience.



JAMES BYUN
Portfolio Manager
RE License 01916074
424.320.5224 (d)
jbyun@rexfordindustrial.com
rexfordindustrial.com | NYSE: REXR



Rexford Industrial Realty, Inc.
915 Wilshire Boulevard, Suite 1950
Los Angeles, CA 90017

   



**From:** Stephen Mastey <Stephen@DermOrganic.com>
**Sent:** Wednesday, August 18, 2021 4:25 PM

1

**To:** James Byun <jbyun@rexfordindustrial.com>
**Subject:** Do you want me to pay or to get out?

EXTERNAL EMAIL: Exercise caution before clicking attachments/links.

Serious question.
My book keeper only works maybe 10 hours a month right now.  She came in today.
I had her cut a check and it is signed - but then I received papers from the court?
Not sure why someone didn't just call or email me before doing this.
323-428-2877

**Stephen Mastey,** President & Founder
**DermOrganic Laboratories, Inc.** | 25413 Rye Canyon Road | Santa Clarita, CA 91355
Office 661-257-4814 x231 | Fax 661-257-9203 | Toll-Free 800-662-7839
www.DermOrganic.com

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

2

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
| COURTHOUSE ADDRESS:<br>Chatsworth Courthouse<br>9425 Penfield Avenue, Chatsworth, CA 91311 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**10/04/2021**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ M. Vargas _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>21CHCV00774 |

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✓ | Stephen P. Pfahler | F49 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 10/05/2021
  (Date)

LACIV 190 (Rev 6/18)
LASC Approved 05/06

Sherri R. Carter, Executive Officer / Clerk of Court

By M. Vargas _____ , Deputy Clerk

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**



## Superior Court of California, County of Los Angeles

---

### ALTERNATIVE DISPUTE RESOLUTION (ADR)
### INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### <u>What is ADR?</u>
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### <u>Advantages of ADR</u>
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control** with the parties: Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### <u>Disadvantages of ADR</u>
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### <u>Main Types of ADR:</u>

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

---

**How to arrange mediation in Los Angeles County**
Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online).

   - JAMS, Inc.: **Case Manager (213) 253-9776** mdawson@jamsadr.com
   - Mediation Center of Los Angeles: **Case Manager: (833) 476-9145** info@mediationLA.org

**These organizations cannot accept every case and they may decline cases at their discretion.**
Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
NOTE: This service is not available for family law, probate or small claims.

b. **Los Angeles County Dispute Resolution Programs**
   https://wdacs.lacounty.gov/programs/drp/
   - Free, day- of- trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
   - Free or low-cost mediations before the day of trial for these and other case types.
   - For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit
     http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. **Mediators and ADR and Bar organizations that provide mediation may be found on the internet.**

---

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: www.lacourt.org/division/civil/settlement

**Los Angeles Superior Court ADR website:** www.lacourt.org/division/civil/settlement
**For general information and videos about ADR, visit** http://www.courts.ca.gov/programs-adr.htm

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )   FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING  )
FOR CIVIL                       )
                                 )
                                 )
                                 )

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all

documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los

Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex

Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).)

All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the

following:

1) DEFINITIONS

   a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to

      quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling

      portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"** A transaction through the electronic service provider for submission

      of documents to the Court for processing which may contain one or more PDF documents

      attached.

   d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a

      document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

2019-GEN-014-00

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2019-GEN-014-00

1    d) Documents in Related Cases

2    Documents in related cases must be electronically filed in the eFiling portal for that case type if

3    electronic filing has been implemented in that case type, regardless of whether the case has

4    been related to a Civil case.

5    3) EXEMPT LITIGANTS

6    a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt

7    from mandatory electronic filing requirements.

8    b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of

9    Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused

10    from filing documents electronically and be permitted to file documents by conventional

11    means if the party shows undue hardship or significant prejudice.

12    4) EXEMPT FILINGS

13    a) The following documents shall not be filed electronically:

14    i)    Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of

15    Civil Procedure sections 170.6 or 170.3;

16    ii)    Bonds/Undertaking documents;

17    iii)    Trial and Evidentiary Hearing Exhibits

18    iv)    Any ex parte application that is filed concurrently with a new complaint including those

19    that will be handled by a Writs and Receivers department in the Mosk courthouse; and

20    v)    Documents submitted conditionally under seal. The actual motion or application shall be

21    electronically filed. A courtesy copy of the electronically filed motion or application to

22    submit documents conditionally under seal must be provided with the documents

23    submitted conditionally under seal.

24    b) Lodgments

25    Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in

26    paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

27    //

28    //

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when technologically feasible without impairment of the document's image.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

    i)    Depositions;

    ii)   Declarations;

    iii)  Exhibits (including exhibits to declarations);

    iv)   Transcripts (including excerpts within transcripts);

    v)    Points and Authorities;

    vi)   Citations; and

    vii)  Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

2019-GEN-014-00

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

  i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing.  Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.    (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

  ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of:  (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day _before_ the ex parte hearing.

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i)    Any printed document required pursuant to a Standing or General Order;

   ii)   Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii)  Pleadings and motions that include points and authorities;

   iv)   Demurrers;

   v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi)   Motions for Summary Judgment/Adjudication; and

   vii)  Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

2019-GEN-014-00

1   11)  SIGNATURES ON ELECTRONIC FILING

2        For purposes of this General Order, all electronic filings must be in compliance with California

3   Rules of Court, rule 2.257.  This General Order applies to documents filed within the Civil

4   Division of the Los Angeles County Superior Court.

5

6        This First Amended General Order supersedes any previous order related to electronic filing,

7   and is effective immediately, and is to remain in effect until otherwise ordered by the Civil

8   Supervising Judge and/or Presiding Judge.

9

10  DATED:  May 3, 2019                    _Kevin C. Brazile_

11                                           KEVIN C. BRAZILE
                                             Presiding Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GEN-16-Limited Jurisdiction Portal-PJ

**FILED**
Superior Court of California
County of Los Angeles

**JUN 29 2016**

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re Limited Jurisdiction Civil Cases Calendared in the Los Angeles County Superior Court | GENERAL ORDER RE LIMITED JURISDICTION CIVIL PROCEDURES: NOTICE OF WEB PORTAL AVAILABILITY FOR INTERPRETER REQUESTS (Effective July 11, 2016) |

TO EACH PARTY:

In order to expedite the availability of interpreters at hearings on limited jurisdiction civil cases, IT IS HEREBY ORDERED that each limited jurisdiction civil plaintiff shall, along with the complaint and other required documents, serve all named defendants with the *Notice of the Availability of Web Portal for Interpreter Requests*; this notice informs the litigants that the Los Angeles County Superior Court provides interpreter services in limited jurisdiction civil cases at no cost to parties with limited English proficiency and that Spanish language interpreters are available in courtrooms where limited jurisdiction civil hearings are held. The notice will be provided to the plaintiff at the time the limited jurisdiction civil action is filed, if filed at the clerk's office, and will also be posted on the Los Angeles County Superior Court internet website (http://www.lacourt.org/). Plaintiff(s) must then indicate service of the *Notice of Availability of Web Portal for Interpreter Requests* on line 2(f) of the Proof of Service of Summons form (POS-010).

Effective immediately, this General Order is to remain in effect until otherwise ordered by the Presiding Judge.

DATED: June 29, 2016



_____
CAROLYN B. KUHL
Presiding Judge

GENERAL ORDER – LIMITED JURISDICTION CIVIL PORTAL

## Notice of Availability of Limited Civil Jurisdiction Web Portal for Interpreter Requests

The Los Angeles Superior Court provides interpreter services at no cost to parties with limited English proficiency in Limited Civil Jurisdiction hearings. Spanish interpreters are available at all courthouse locations. Therefore, it is not necessary to request a Spanish language interpreter in advance. If you require a Spanish interpreter, please let the courtroom staff know about your need on the day of your hearing.  Limited English proficient individuals who speak a language other than Spanish may request an interpreter in advance of their court hearing via the Court's Web Portal for Interpreter Requests http://www.lacourt.org/irud/UI/index.aspx. While the Court will make every effort to locate an interpreter for the date and time of your hearing, it cannot guarantee that one will be immediately available. If you have general questions about language access services, please contact us at LanguageAccess@LACOURT.org.

## Ծանուցագիր սահմանափակ իրավասության քաղաքացիական գործընթաց թարգմանչական ծառայության խնդրանք ներկայացնելու համար նախատեսված առցանց դարպասի առկայության մասին

Los Անջելեսի Առավին առաջին դատարանն ամենամ դատավարան քաղաքացիական ծառայություններ է տրամադրում սահմանափակ իրավասության քաղաքացիական վարույթներին՝ անգլերենի սահմանափակ իմացություն ունեցող կողմերին։ Իսպաներենի թարգմանիչներ առկայացնում բոլոր դատարանններում ապահովված է։ Ուստի, խաղմեներին թարգմանիչ հայտ ևամ ոարդուր ներկայացուցիչ դահիֆի անձնավոր ։ Անգլերենի սահմանափակ խմացություն ունեցող ՞ել իսպաներենից տարբեր լեզուներ  Հել խռապ ՞ ։ Անգլերենն սահմանափակ խմացություն ունեցող անձինք, ովքեր խոսում են իսպաներենից բացի այլ մեկ այլ լեզվով, կարող են թարգմանչի խնդրանք ներկայացնել նախօրոք՝ նախքան իրենց լսման օրը, Դատարանի՝ Թարգմանչական դատապանն ամեն ինչ կանեն Ձեր լսման օրն ու ժամին թարգմանչի ներկայությունը ապահովելու համար, սակայն դատապանը չի վերապերող հարցերով խնդրում եք դիմել LanguageAccess@LACOURT.org:

## 关于小额索赔传译员申请门户的可用性通知

在小额索赔庭审中，洛杉矶高等法院为英语能力有限的各方人士提供免费传译服务。在举行小额索赔庭审的所有法庭中，均有现成的西班牙语传译员。如果您需要西班牙语传译员，请在您的庭审当日将您的需求告知法庭工作人员。在庭审前，英语能力有限的非西班牙语人士可通过法院的传译员申请网络门户 http://www.lacourt.org/irud/UI/index.aspx提前申请传译员。法院会尽力按照您的庭审日期和时间安排传译员，但法院无法保证能够即时提供传译员。如果您对于语言服务的疑问，请联系 LanguageAccess@LACourt.org

## 통역사 신청을 위한 소액 청구 웹 포털 이용 통지

로스앤젤레스 상급법원은 소액 청구 심리에서 영어가 능숙하지 않은 당사자들에 대해통역 서비스를 무료로 제공합니다. 스페인어 통역사는 소액 청구 심리가 열리는 모든 법정에서 손쉽게 제공할 수 있습니다. 스페인어 통역사가 필요한 경우에는 심리가 열리는 날에 법정 직원에게 알려 주십시오. 스페인어가 아닌 다른 언어를 사용하고 영어가 능숙하지 않은 개인들은 통역사 신청을 위한 법원 웹 포털을 통해서 재판일 전에 통역사를 신청할 수 있습니다 http://www.lacourt.org/irud/UI/index.aspx. 법원은 심리 날짜와 시간에 통역사를 찾기 위해 모든 노력을 기울일 것이나, 통역사를 즉시 제공한다는 것을 보장할 수 없습니다. 언어 접근 서비스에 대한 질문이 있으시면, 다음의 이메일 주소로 연락해 주십시오: LanguageAccess@LACourt.org.

## Aviso de disponibilidad del Portal web para jurisdicción limitada civil para solicitar intérpretes

La corte superior de Los Ángeles brinda servicios de intérprete sin cargo para audiencias de jurisdicción limitada civil a las partes que tienen conocimientos limitados de inglés.  Se dispone de intérpretes de español en todos los juzgados. Por lo tanto, no es necesario pedir un intérprete de español por adelantado. Si necesita un intérprete de español, infórmele al personal de la sala del juzgado el día de su audiencia.  Los individuos con conocimientos limitados de inglés que hablan un idioma que no sea el español pueden solicitar un intérprete antes de la audiencia en la corte por medio del Portal web de la corte para solicitar intérpretes http://www.lacourt.org/irud/UI/index.aspx. La corte hará el mayor esfuerzo posible para programar un intérprete para la fecha y hora de su audiencia; sin embargo, no le podemos garantizar de que haya uno disponible en forma inmediata. Si tiene preguntas generales sobre los servicios de acceso lingüístico, envíe un mensaje a LanguageAccess@LACourt.org.

## Thông Báo về Cổng Web Thẩm Quyền Hộ Sự Giới Hạn để Xin Cung Cấp Thông Dịch Viên

Tòa Thượng Thẩm Los Angeles cung cấp dịch vụ thông dịch viên miễn phí cho những bên kiện có khả năng Anh Ngữ giới hạn trong những phiên tòa có thẩm quyền Hộ Sự Giới Hạn.  Có sẵn thông dịch viên tiếng Tây Ban Nha tại tất cả các tòa. Do đó, không cần phải xin cung cấp thông dịch viên tiếng Tây Ban Nha trước. Nếu quý vị cần thông dịch viên tiếng Tây Ban Nha, xin cho nhân viên phòng xử biết về nhu cầu của quý vị vào ngày quý vị ra tòa. Người có khả năng Anh Ngữ giới hạn và nói một ngôn ngữ không phải tiếng Tây Ban Nha có thể xin cung cấp thông dịch viên trước ngày có phiên tòa của họ qua Cổng Web của Tòa cho Các Yêu Cầu Cung Cấp Thông Dịch Viên http://www.lacourt.org/irud/UI/index.aspx. Tùy tòa sẽ nổ lực để tìm một thông dịch viên cho ngày giờ phiên tòa của quý vị, tòa không thể bảo đảm sẽ có ngay. Nếu quý vị có thắc mắc tổng quát về các dịch vụ ngôn ngữ, xin liên lạc với chúng tôi tại LanguageAccess@LACOURT.org.

August 5, 2016

 

**dcba.lacounty.gov**

# Resolve your lawsuit online before your trial date

 

**Use Online Dispute Resolution from the County of Los Angeles Department of Consumer and Business Affairs. Our mediation services are available at no cost and can help you resolve your case from the comfort of your own home.**

## How We Can Help:

**Efficient and effective:** With Online Dispute Resolution, you are in control, not the courts. You decide whether a settlement is right for you. You save time and money, and avoid the inconvenience of going to Small Claims Court.

**Flexible:** You can select the schedule and type of Online Dispute Resolution that works best for you. You can live chat with a mediator, submit an offer to settle, or participate in a video mediation.

**Experienced:** Our trained mediators are neutral third parties who can help you reach a reasonable settlement.

## How to get started with Online Dispute Resolution:

### Visit our website

dcba.lacounty.gov

### Email us at

mediation@dcba.lacounty.gov

### Or call

(213) 974-0826

 

**LOS ANGELES COUNTY CONSUMER & BUSINESS AFFAIRS**

**dcba.lacounty.gov**

# Resuelva su demanda por Internet antes de la fecha de su juicio

 

**Use el servicio virtual de resolución de disputas (Online Dispute Resolution) del Departamento de Servicios Para Consumidores y Negocios del Condado de Los Ángeles. Nuestros servicios son gratuitos y pueden ayudarle a resolver su caso desde la comodidad de su hogar.**

## Podemos ayudarle. Nuestro servicio es:

**Eficiente y Eficaz:** Con el servicio de resolución de disputas, usted está en control, no la corte. Usted decide si está satisfecho con el acuerdo logrado. Este método le puede ahorrar tiempo, dinero y evitarle la inconveniencia de ir a corte.

**Flexible:** Puede utilizar nuestro sistema virtual para seleccionar la fecha y el método más conveniente para usted. También podrá elegir la opción de comunicarse con su mediador por "chat", proponer su propio acuerdo, o participar en sesiones de mediación por videoconferencia.

**Profesional:** Nuestros mediadores están capacitados, son imparciales, y podrán ayudarle en llegar a un acuerdo razonable.

## Como iniciar una resolución con nuestro servicio:

### Visite Nuestra Sitio Web

dcba.lacounty.gov

### Envié un Correo Electrónico

mediation@dcba.lacounty.gov

### O Llame

(213) 974-0826